Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Steven T. Henesy, Esq.
Garin Scollan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE  COMPANY and GEICO CASUALTY                    Docket No.:
COMPANY,

                                Plaintiffs,

                                                                                 **Plaintiff Demands a**

          -against-                                                 **Trial by Jury**

NORTHERN MEDICAL CARE, P.C.,
OMAR F. AHMED, M.D.,
QUEENS WELLNESS MEDICAL, P.C.,
MADHU BABU BOPPANA, M.D.,
RESTORALIGN CHIROPRACTIC, P.C.,
DAVID S. KRASNER, D.C.,
WEI DAO ACUPUNCTURE, P.C.,
BORUCH LAOSAN, INC., and
IGOR MAYZENBERG, L.AC.

                                 Defendants.
-----------------------------------------------------------------X

## <u>COMPLAINT</u>

      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $2,963,000.00 that the Defendants, Northern Medical Care, P.C. ("Northern Medical"), Omar F. Ahmed, M.D. ("Dr. Ahmed"), Queens Wellness Medical, P.C. ("Queens Medical"), Madhu Babu Boppana, M.D. ("Dr. Boppana"), Restoralign Chiropractic, P.C. ("Restoralign Chiro"), David S. Krasner, D.C. ("Krasner"), Wei Dao Acupuncture, P.C. ("Wei Dao Acu"), Boruch Laosan, Inc. ("Boruch Laosan"), and Igor Mayzenberg, L.Ac. ("Mayzenberg") (collectively, "Defendants"), wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent No-Fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including spurious examinations, computerized range of motion and muscle strength testing, physical performance testing, outcome assessment testing, physical therapy services, neurological examinations, electrodiagnostic testing, acupuncture services, and chiropractic services (the "Fraudulent Services") allegedly provided to New York automobile accident victims covered by insurance policies issued by GEICO ("Insureds").

2.    The Fraudulent Services were the product of a scheme perpetrated by the Defendants at a purported medical clinic located at 105-20 Northern Boulevard, Corona, New York 11368 (the "Northern Boulevard Clinic"), where the Defendants generated high volumes of patients that could be subjected to the Fraudulent Services through the payment of hundreds of thousands of dollars in illegal kickbacks.

3.    Mayzenberg spearheaded the scheme by using Boruch Laosan to sublease space to other healthcare providers at the Northern Boulevard Clinic and by paying kickbacks in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic.  To conceal the kickbacks, Mayzenberg funneled monies to the bank accounts of his defunct

professional corporations, Sanli Acupuncture, P.C. ("Sanli"), and Laogong Acupuncture, P.C. ("Laogong"), which were then used to pay hundreds of thousands of dollars in kickbacks via shell companies. Dr. Ahmed, Dr. Boppana, and Krasner further paid kickbacks themselves to individuals and entities that referred automobile accident victims to the Northern Boulevard Clinic.

4.      In furtherance of the scheme, the Defendants implemented fraudulent predetermined treatment and billing protocols at the Northern Boulevard Clinic, subjecting the Insureds to the Fraudulent Services, which were then billed to GEICO and other New York automobile insurers under the names of Northern Medical, Queens Medical, Restoralign Chiro, and Wei Dao Acu (collectively, the "PC Defendants"). Through the fraudulent scheme, the Defendants exploited the Insured's No-Fault insurance benefits and billed for huge volumes of the Fraudulent Services provided solely for profit and without regard for genuine patient care.

5.      By this action, GEICO seeks recovery of the substantial sums stolen from it, along with a declaration that it is not legally obligated to pay reimbursement of more than $3,161,000.00 in pending No-Fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

      (i)     the PC Defendants have no right to receive payment for any pending bills because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

      (ii)    the PC Defendants have no right to receive payment for any pending bills for the Fraudulent Services, because the Defendants engaged in a scheme to defraud New York automobile insurers using unlawful fee-splitting, kickback, and illegal referral arrangements in violation of New York law; and

(iii)   the PC Defendants have no right to receive payment for any pending bills because the PC Defendants intentionally and fraudulently misrepresented and exaggerated the level of services purportedly provided in order to inflate the charges submitted to GEICO.

6.      Defendants fall into the following categories:

(i)     The PC Defendants are medical, chiropractic, and acupuncture professional corporations through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO, for the sole purpose of exploiting the Insureds' No-Fault insurance benefits;

(ii)    Dr. Ahmed, Dr. Boppana, and Krasner (collectively, the "Subleasing Owner Defendants"), are licensed health care professionals in the State of New York. Dr. Ahmed owns Northern Medical, Dr. Boppana owns Queens Medical, and Krasner owns Restoralign Chiro;

(iii)   Mayzenberg is an acupuncturist licensed to practice acupuncture in the State of New York and owns Wei Dao Acu and Boruch Laosan; and

(iv)    Boruch Laosan is a New York corporation that was the leaseholder of the Northern Boulevard Clinic that Mayzenberg used to sublease office space to professional corporations at the Northern Boulevard Clinic, including but not limited to Northern Medical, Queens Medical, and Restoralign Chiro (collectively, the "Subleasing PC Defendants").

7.      As discussed below, the Defendants, at all relevant times, have known that: (i) the Defendants engaged in a scheme to defraud New York automobile insurers using unlawful fee-splitting, kickback, and illegal referral arrangements in violation of New York law; (ii) the Fraudulent Services were ordered and performed pursuant to fraudulent, predetermined protocols designed solely to maximize charges to GEICO and other insurers, not because they were medically necessary or designed to facilitate the treatment of the GEICO insureds who purportedly have been subjected to them; and (iii) the billing for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

8.      As such, the PC Defendants do not now have – and never had – any right to be

compensated for the Fraudulent Services that have been billed to GEICO through the PC Defendants.

9.     The charts annexed hereto as Exhibits "1" – "4" set forth representative samples of the fraudulent claims that have been identified to date that the PC Defendants have submitted, or caused to be submitted, to GEICO.

10.     The Defendants' fraudulent scheme, which commenced in or about 2015, has continued uninterrupted through present day in that Defendants continue to seek to recover on the bills for the Fraudulent Services.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,958,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company, are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

12.     Defendant Northern Medical is a New York medical professional corporation with the Northern Boulevard Clinic as its listed principal place of business.  Northern Medical was incorporated on or about August 6, 2014.

13.     Defendant Dr. Ahmed resides in and is a citizen of New York. Dr. Ahmed is a medical doctor who has been licensed to practice medicine in New York since June 15, 2006 and has owned Northern Medical since August 15, 2014, the date when Dr. Boppana purportedly transferred his 100% ownership stake in Northern Medical to Dr. Ahmed.

14.     Defendant Queens Medical is a New York medical professional corporation with the Northern Boulevard Clinic as its listed principal place of business. Queens Medical was incorporated on or about July 6, 2017.

15.     Defendant Dr. Boppana resides in and is a citizen of New York. Dr. Boppana is a licensed medical doctor who has been licensed to practice medicine in New York since April 25, 1995 and owns Queens Medical.

16.     Defendant Restoralign Chiro is a New York chiropractic professional corporation with the Northern Boulevard Clinic as its listed principal place of business. Restoralign Chiro was incorporated on or about September 11, 2014.

17.     Defendant Krasner resides in and is a citizen of Pennsylvania. Krasner has been licensed to practice chiropractic in New York since July 23, 1975 and owns Restoralign Chiro.

18.     Defendant Wei Dao Acu is a New York acupuncture professional corporation with 2166 79 Street, Brooklyn, New York as its listed principal place of business. Wei Dao Acu was incorporated on or about August 6, 2012.

19.     Boruch Laosan is a New York corporation with 1755 East 23rd Street, Brooklyn, New York as its listed principal place of business.  Boruch Laosan was incorporated in New York in or about June 24, 2014.

20.     Defendant Mayzenberg resides in and is a citizen of New York.  Mayzenberg has been licensed to practice acupuncture in New York since April 26, 1993 and owns Wei Dao Acu and Boruch Laosan.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Statutes

24.     GEICO underwrites automobile insurance in New York.

25.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

27.     An Insured can assign his or her right to No-Fault Benefits to the providers of health care services in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

28.     In New York, claims for No-Fault Benefits are governed by the New York State Workers' Compensation Fee Schedule (the "Fee Schedule").

29.     When a health care provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

30.     Pursuant to the No-Fault Laws, a health care provider is not eligible to bill for or to collect No-Fault Benefits if it unlawfully incorporated or fails to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

32.     In New York, only a licensed health care professional may: (i) practice the pertinent health care profession; (ii) own and control a professional corporation authorized to operate a professional health care practice; (iii) employ and supervise other health care professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from health care professional services. Unlicensed individuals may not: (i) practice the pertinent health care profession; (ii) own or control a professional corporation authorized to operate a professional health care practice; (iii) employ or supervise health care professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional health care services.

33.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

34.     New York Law further prohibits anyone from engaging in for profit the referring of persons for medical care or treatment and prohibits health care clinics from splitting fees with medical referral services. See New York Public Health Law §4501 and §2811.

35.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, chiropractic, and acupuncture, from practicing the profession and from sharing in the fees for professional services.

36.     Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed.

37.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, shares fees for professional services with unlicensed persons, and/or is "owned" by professionals who do not engage in the practice of their profession through the professional corporation.

38.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that health care providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

39.     In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 2019 N.Y. Slip Op. 04643 (June 11, 2019) the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

40.     Pursuant to the No-Fault Laws, only health care services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits.  There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

41.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

42.     Beginning in 2015, the Defendants masterminded and executed a complex fraudulent scheme wherein the PC Defendants were used to bill GEICO and the New York automobile insurance industry for millions of dollars in no-fault insurance benefits they were never entitled to receive.

43.     The Fraudulent Services that were billed through the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to genuinely treat or otherwise benefit Insureds.

44.     To effectuate the scheme, Mayzenberg funneled money from the bank accounts of other companies under his name, including Wei Dao Acu, Boruch Laosan, and Mingmen Acupuncture, P.C. ("Mingmen") to his personal bank account, and then from his personal bank account to the bank accounts of Mayzenberg's defunct companies, Sanli and Laogong. Mayzenberg then used the bank accounts of Sanli and Laogong to pay kickbacks in exchange for patient referrals to the Northern Boulevard Clinic.

45.     To further effectuate the scheme, the Subleasing Owner Defendants also paid kickbacks in exchange for patient referrals to the Northern Boulevard Clinic.

46.     Once the patients were referred to the Northern Boulevard Clinic, the PC Defendants purported to provide the Fraudulent Services which were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**A.  The Illegal Kickback and Referral Scheme**

47.     Mayzenberg and the Subleasing Owner Defendants did virtually nothing to market the existence of the PC Defendants to the general public.

48.     Mayzenberg and the Subleasing Owner Defendants did virtually nothing to advertise for patients, never sought to build name recognition or make any legitimate efforts of their own to attract patients on behalf of the PC Defendants.

49.     Instead, Mayzenberg and the Subleasing Owner Defendants received a steady volume of patients at the Northern Boulevard Clinic through illegal fee-splitting, kickback, and referral arrangements.

50.     Though ostensibly organized to provide a range of health care services to Insureds at a single location, the Northern Boulevard Clinic in actuality was organized to supply a "one-stop" shop for No-Fault insurance fraud.

51.     The Northern Boulevard Clinic provided a facility for the PC Defendants, as well as a "revolving door" of a multitude of other purported health care providers, all geared towards exploiting New York's No-Fault insurance system.

52.     Those associated with the Northern Boulevard Clinic, including Mayzenberg and the Subleasing Owner Defendants, utilized various unscrupulous tactics in order to generate high volumes of patients that could be subjected to fraudulent No-Fault billing.

**1.     Mayzenberg Paid Kickbacks for Patient Referrals**

53.     Mayzenberg, as the primary leaseholder at the Northern Boulevard Clinic, knew that in order to funnel patients to the Northern Boulevard Clinic, he needed to make kickback payments in exchange for patient referrals.

54.     Specifically, Mayzenberg, using complex transfers of monies to conceal the scheme, issued checks from the bank accounts of Sanli and Laogong as payments for the referral of patients, which payments included checks issued to a series of shell companies disguised as, among other things, putative "advertising", "supply", "consulting", and "billing" companies – secretly owned and operated by Igor Dovman ("I. Dovman") and Tamilla Dovman ("T. Dovman").  (I. Dovman and T. Dovman are collectively known as the "Dovmans", and the shell companies are collectively the "Dovman Shell Entities").

55.     Using the money he funneled from Mingmen, Wei Dao Acu, and Boruch Laosan, Mayzenberg's payment of kickbacks from Sanli's and Laogong's bank accounts allowed the PC Defendants to have access to a steady stream of Insureds at the Northern Boulevard Clinic that could be subjected to the Fraudulent Services billed under the names of the PC Defendants.

56.     Mayzenberg had no genuine doctor-patient relationship with the Insureds that visited the Northern Boulevard Clinic, as the patients had no scheduled appointments with Wei Dao Acu, but were simply directed by the Northern Boulevard Clinic to subject themselves to treatment by the acupuncturist on duty that day, in exchange for the payments of kickbacks from Mayzenberg.

57.     Mayzenberg knew that these arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme, which included funneling money from the Mingmen, Wei Dao Acu, and Boruch Laosan bank accounts to his personal account, and then from his personal account to the bank accounts for Sanli and Laogong, and then to the Dovman Shell Entities, which purported to be, among others, "billing", "consulting", and/or "supply" companies.

58.     However, the payments for "supply", "consulting", or "billing" were never paid for any actual, legitimate supply, consulting, or billing services, but instead were payments made as kickbacks in return for medically unnecessary patient referrals.

59.     Mayzenberg further disguised the fee-splitting and kickback payments by funneling large sums of money to putative "transportation" companies, including entities called All Points Transportation and One of a Kind.

60.     However, the payments by Mayzenberg through Sanli to the transportation companies were not for legitimate transportation services.  Instead, these payments funded a network of "runners" who, in exchange for these monies, delivered automobile accident victims to the PC Defendants and the Northern Boulevard Clinic.

61.     Mayzenberg's ability to pay kickbacks was continually fueled by the millions of dollars paid by New York automobile insurers to Wei Dao Acu, which was generated by the excessive and fraudulently inflated billing.

62.     Mingmen's bank account records show hundreds of thousands of dollars of monies paid to, withdrawn by, or transferred to Mayzenberg, without any legitimate explanation or indication that this was compensation to Mayzenberg as an officer or employee of Mingmen.

63.    Similarly, Sanli's bank account records are inconsistent with the operation of a legitimate business by a single doctor-owner, including a regular and excessive practice of checks being issued with the payor left bank, and checks with different handwriting on them, over the course of many years.

64.    The patient referrals to the Northern Boulevard Clinic that were generated by Mayzenberg and Wei Dao Acu's unlawful kickback and referral scheme were made without regard for the medical necessity of the health care services purportedly performed by the PC Defendants or the Insureds' individual symptoms or needs. The Fraudulent Services were provided – to the extent they were provided at all – solely for financial gain, not to treat or otherwise benefit the Insureds.

### a.    The Dovmans Patient Brokering from the Coney Island Law Office

65.    Beginning in 2015, Mayzenberg became associated with the Dovmans in order to maximize the monetization of automobile accident victims eligible for No-Fault Benefits.

66.    In or around September 2015, the Dovmans began working out of a law office associated with a personal injury attorney, David Feinerman, Esq. ("Feinerman"), located at 2765 Coney Island Avenue, Brooklyn, New York 11235 (the "Coney Island Avenue Office").

67.    Feinerman had previously been disbarred from practicing law in or about March 2006, following allegations from the New York State Attorney Grievance Committee that Feinerman had, among other things, "engaged in a pattern and practice of improperly deducting litigation expenses from his clients' share of personal injury settlement proceeds." See In re Feinerman, 33 A.D.3d 212 (2nd Dept. 2006).

68.     Feinerman was reinstated as an attorney in New York State on March 18, 2015. See In re Feinerman, 126 A.D.3d 901 (2nd Dept. 2015).  Upon his reinstatement, Feinerman continued what had been his pre-disbarment practice of representing Insureds in personal injury actions against automobile insurers, including GEICO, from the Coney Island Avenue Office.

69.     Another personal injury lawyer, Daniel Corley, Esq. ("Corley"), utilized the Coney Island Avenue Office for representing Insureds in personal injury actions.  Corley worked with Feinerman and the Dovmans, but actually resides in Concord, New Hampshire after having moved from New York to New Hampshire in 2005.

70.     The Dovmans, working out of the law office associated with Feinerman and Corley, paid for access to individuals injured in automobile cases and then made sure those persons were referred to the Northern Boulevard Clinic and, in particular, to Mayzenberg, the Subleasing Owner Defendants, and the PC Defendants, in exchange for kickbacks from Mayzenberg, Sanli, and Laogong.

**b.     The Dovman Shell Entities**

71.     Though the Dovmans named the Dovman Shell Entities to create the appearance that they provided services such as "consulting", "garbage removal", or "medical testing", the Dovman Shell Entities did not provide any legitimate goods of services.

72.     In order to conceal their involvement with the Dovman Shell Entities, the Dovmans filed certificates of incorporation with New York State listing individuals as the "incorporator" of the respective entity who either: (i) did not exist; or (ii) had no apparent connection to the underlying entity.

73.     In fact, for many of these certificates of incorporation, the Dovmans listed an individual as the "incorporator" – and represented that that individual had electronically signed the certificate – without the putative "incorporator's" knowledge or consent.

74.     Between September 1, 2015 and the present, Mayzenberg used the corporate bank account for Sanli – a defunct professional corporation that had last treated a patient in 2011 – to pay more than $300,000.00 in kickbacks to the Dovman Shell Entities.

75.     In keeping with the fact that the Dovman Shell Entities were shams involved in a patient brokering scheme, during a March 9, 2018 non-party deposition in Government Employees Ins. Company, et al. v. Mayzenberg, et al., 1:17-cv-02802-ILG-LB (E.D.N.Y. 2017) ("GEICO v. Mayzenberg"), I. Dovman invoked his Fifth Amendment protection against self-incrimination when asked whether he had incorporated a series of companies as a means of concealing a fraudulent kickback scheme.

76.     By July 2017, Mayzenberg became aware that GEICO had obtained bank records for Mingmen, Sanli, and his own personal account. Therefore, Mayzenberg began to take steps to further secrete his assets and continue his unlawful payments into the Dovman Shell Entities in exchange for patient referrals.

77.     Toward that end, during the summer of 2017, Mayzenberg altered his practices to avoid further detection. Instead of transferring monies from Mingmen into his personal account and then into the Sanli account, Mayzenberg began to move monies into the account of a long-defunct acupuncture professional corporation, Laogong, which was dissolved by proclamation of the New York Department of State on July 28, 2010.

78.     Though the Laogong bank account had, since at least 2011, been largely inactive, Mayzenberg began using the account in furtherance of the Defendants' scheme in August 2017.

79.     Specifically, though it had never previously made any payments to the Dovman Shell Entities, Mayzenberg issued a series of checks to the Dovman Shell Entities from the long-dormant Laogong account.

80.     In keeping with the fact that the payments from Mayzenberg, Sanli, and Laogong were kickbacks, Mayzenberg's testimony during a March 15, 2018 deposition in <u>GEICO v. Mayzenberg</u> indicated, among other things, that:

    (i)    Mayzenberg could not identify a single person associated with the Dovman Shell Entities;

    (ii)    Mayzenberg could not verify that the Dovman Shell Entities provided any actual services at all; and

    (iii)    Mayzenberg's only measure of whether the Dovman Shell Entities were doing anything at all in exchange for the payments from Mayzenberg, Sanli, and Laogong was whether Mayzenberg continued to see a steady stream of patients.

81.     In exchange for the payments funneled from Mayzenberg, Sanli, and Laogong to the Dovman Shell Entities, the Dovmans caused patients to be referred to Mayzenberg and the Northern Boulevard Clinic for the Fraudulent Services, which were then billed through the PC Defendants to automobile insurers, including GEICO.

82.     In keeping with the fact that the payments from Mayzenberg, Sanli, and Laogong – using the funds funneled from the Wei Dao Acu and Boruch Laosan bank accounts – were kickbacks in exchange for patient referrals, during a March 9, 2018 deposition in <u>GEICO v. Mayzenberg</u>, when asked whether the payments from Mayzenberg, Sanli, and Laogong were kickbacks in exchange for patient referrals, I. Dovman invoked his Fifth Amendment protection against self-incrimination.

## 2. The Subleasing PC Defendants Paid Kickbacks for Patient Referrals

83.     The Subleasing Owner Defendants, as a precondition of renting office space at the Northern Boulevard Clinic, also were required to pay kickbacks in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic.

84.     Specifically, the Subleasing Owner Defendants through their companies paid hundreds of thousands of dollars in kickbacks to a series of individuals and entities that purported to provide legitimate business services, but instead were used as vehicles to conceal payments made as kickbacks (the "Referral Sources") in return for medically unnecessary patient referrals to the Northern Boulevard Clinic.  The Referral Sources included a series of shell companies disguised as, among other things, putative "marketing", "advertising", "consulting", "transportation", "cleaning", "administrative", and "construction" companies.

85.     For example, in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic, Dr. Ahmed made at least $70,000.00 worth of payments from a bank account associated with his professional corporation, Queens Corona Medical, P.C. ("Queens Corona"), to entities with no legitimate business operations, including payments to (i) a purported network services company totaling at least $24,000.00; (ii) a purported professional administrative services company totaling at least $17,000.00; and (iii) a purported computer and network services company totaling at least $13,000.00.

86.     Though Queens Corona's name gives it the appearance of a health care professional corporation, Queens Corona has never billed GEICO for treating Insureds.

87.     Dr. Ahmed issued the checks out of Queens Corona's corporate bank account to conceal the payments from insurers, including GEICO.

88.     In the same manner that Dr. Ahmed used Queens Corona to pay kickbacks, Dr. Boppana made kickback payments through a bank account associated with his corporation, Science and Art, Inc., in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic.

89.     For example, Dr. Boppana made payments from Science and Art, Inc.'s bank account to several companies with no legitimate business operations, including payments to (i) a purported medical supply company totaling at least $10,000.00; (ii) a purported human resources company totaling at least $8,000.00; and (iii) a purported cleaning company totaling at least $7,000.00.

90.     In addition to using the bank account of Science and Art, Inc., Dr. Boppana used Queens Medical's bank account to pay at least $100,000.00 in kickbacks to the Referral Sources in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic, including to, among others, a purported "marketing" company.

91.     Similarly, Krasner used Restoralign Chiro's bank account to pay at least $79,000.00 in kickbacks to the Referral Sources in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic, including to, among others, purported "advertising", "consulting", and "marketing" companies.

92.     In keeping with the fact that the Subleasing Owner Defendants paid kickbacks as a precondition of renting office space at the Northern Boulevard Clinic, Dr. Ahmed, Dr. Boppana, and Krasner's companies each paid similar entities with no legitimate business operations, including a purported human resources company and purported cleaning company.

93.     Like the payments by Mayzenberg, Dr. Boppana (using Queens Medical's bank account) and Krasner (using Restoralign Chiro's bank account) further disguised the fee-splitting

and kickback payments by funneling large sums of money to a putative "transportation" company called Alper Transportation.

94.     In keeping with the fact that the payments made by the Subleasing Owner Defendants through the Subleasing PC Defendants, Queens Corona, and Science and Art, Inc. were kickbacks in exchange for patient referrals, the Referral Sources paid were some of the same companies paid by Tea Kaganovich ("Kaganovich") and Ramazi Mitaishvili ("Mitaishvili"), who admitted to paying approximately $18.5 million in kickbacks for the referral of patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx in connection with pleading guilty to health care fraud in the Eastern District of New York. United States of America v. Tea Kaganovich, Ramazi Mitaishvili, 17-CR-00649 (E.D.N.Y. 2019)

95.     In further keeping with the fact that the payments made by the Subleasing Owner Defendants to these companies were kickbacks in exchange for patient referrals, during their July 25, 2019 deposition in Government Employees Ins. Company, et al. v. Weinberger, D.C. et al., 1:18-cv-06641(NGG)(RER) (E.D.N.Y. 2018), both Kaganovich and Mitaishvili invoked their Fifth Amendment protection against self-incrimination when asked whether they had issued checks to certain Referral Sources as payments in exchange for patient referrals, many of which were the same Referral Sources paid by the Subleasing Owner Defendants.

96.     The payment of kickbacks by the Subleasing Owner Defendants through the Subleasing PC Defendants, Queens Corona, and Science and Art, Inc. to the Referral Sources allowed the Subleasing Owner Defendants and Mayzenberg to have access to a steady stream of Insureds at the Northern Boulevard Clinic that could be subjected to the Fraudulent Services billed under the names of the PC Defendants.

97.     The Subleasing Owner Defendants' ability to pay kickbacks was continually fueled by the millions of dollars paid by New York automobile insurers to the Subleasing PC Defendants, which was generated by the Fraudulent Services and excessive billing that resulted from the Insureds being referred to the Northern Boulevard Clinic.

98.     The referrals to the Subleasing PC Defendants from the Referral Sources were made without regard for the medical necessity of the health care services purportedly performed by the Subleasing PC Defendants or the Insureds' individual symptoms or needs. The Fraudulent Services were provided – to the extent they were provided at all – solely for financial gain, not to treat or otherwise benefit the Insureds.

99.     The Subleasing Owner Defendants and the Subleasing PC Defendants would not have had access to the Northern Boulevard Clinic and the Insureds but for the payment of kickbacks.

100.    No legitimate professional owner of a medical practice, exercising independent judgement in the best interests of patients, would refer or direct Insureds to the PC Defendants for treatment when the Fraudulent Services that the PC Defendants purported to perform and/or provided played no genuine role in the treatment or care of the Insureds.

101.    In addition to making payments to the Referral Sources, the Subleasing PC Defendants, to the extent that the Subleasing PC Defendants entered into written lease or other agreements with Mayzenberg and Boruch Laosan to rent space at the Northern Boulevard Clinic, entered into sham agreements in that the agreements were not consistent with fair market value to "lease" space.

102.    The Subleasing PC Defendants paid more than the fair market value to "lease" space from Mayzenberg and Boruch Laosan at the Northern Boulevard Clinic because the

purported lease payments were disguised kickbacks in exchange for gaining access to the patients referred to the Northern Boulevard Clinic by the Referral Sources.

### 3. Mayzenberg's Illegal Payments to Medical Referral Services

103.    In addition to the other kickbacks paid to generate patient referrals, Mayzenberg made illegal payments to entities operating as illegal medical referral services set up to exploit individuals injured in automobile accidents.

104.    In exchange for these payments from Mayzenberg, the medical referral services illegally steered patients to the Northern Boulevard Clinic and the PC Defendants.

105.    Mayzenberg made payments to a company called Nina Brouk Advertisement, LLC ("Nina Brouk") and a company called Dona Catalina Marketing, LLC ("Dona Catalina").

106.    Nina Brouk and Dona Catalina provided no actual, direct, or genuine advertising for Wei Dao Acu or the Northern Boulevard Clinic.

107.    These payments from Mayzenberg to the medical referral services were illegal referral fees paid simply to ensure that the medical referral services directed Insureds to the Northern Boulevard Clinic in violation of New York law.

### B. The Defendants' Fraudulent Treatment and Billing Protocols

108.    The Defendants, using fraudulent treatment and billing protocols, engaged in a scheme designed to bill GEICO and the New York automobile insurance industry millions of dollars for the performance of the Fraudulent Services.

109.    The PC Defendants, in accordance with the Defendants' predetermined fraudulent treatment and billing protocols, subjected the Insureds to a myriad of illusory and medically unnecessary health care services at the Northern Boulevard Clinic, regardless of the severity of the auto accident or the nature of the Insured's injuries.  The protocols were designed to

maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

130.    As part of the scheme, the Defendants also purported to subject the Insureds to medically unnecessary "testing" provided pursuant to predetermined, fraudulent protocols, and referred the Insureds to the PC Defendants, without regard for the Insureds' individual symptoms or presentation, or the absence of any actual medical problems arising from any actual automobile accidents.

131.    Each of the steps in the fraudulent testing and treatment protocols were designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent No-Fault billing for each Insured.

132.    Patients purportedly underwent an initial examination, and as a result, each patient was diagnosed with conditions that varied little, with the examining provider consistently concluding that the same predetermined, excessive, and unnecessary treatment was medically necessary for each patient. The examinations invariably led to numerous follow-up examinations, computerized range of motion, physical performance testing, outcome assessment testing, physical therapy services, followed by nerve conduction velocity tests and electromyography tests, chiropractic services, and acupuncture services.

133.    No legitimate health care practitioner, exercising independent medical judgment, would have permitted the fraudulent treatment and billing protocols described below to proceed under his or her auspices.

134.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because (ii) the Defendants' focus was on profit rather

than on patient care; and (ii) all of the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

### 1. The Fraudulent Initial Examinations by Northern Medical and Queens Medical

135.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Dr. Ahmed and Northern Medical and Dr. Boppana and Queens Medical purported to provide virtually every Insured in Exhibits "1" and "2" with an initial examination which resulted in strikingly similar diagnoses and caused the examining provider to recommend nearly identical, predetermined treatment plans for virtually all Insureds.

136.    The predetermined treatment plans by Dr. Ahmed, Northern Medical, Dr. Boppana, and Queens Medical required the Insureds to return to the Northern Boulevard Clinic several times per week for months on end for a litany of spurious health care services including excessive physical therapy, chiropractic manipulation, acupuncture treatment and diagnostic testing.

137.    From September 2014 through May 2017, Dr. Ahmed performed, or purported to perform, the initial examinations at the Northern Boulevard Clinic through Northern Medical.

138.    In June 2017, as Dr. Ahmed and Northern Medical ceased providing initial examinations to patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical performed, or purported to perform, the initial examinations for new patients at the Northern Boulevard Clinic. (Northern Medical, Dr. Ahmed, Queens Medical, and Dr. Boppana are collectively referred to as the "Medical PC Defendants").

139.    The fraudulent treatment protocols employed by Dr. Ahmed and Northern Medical surrounding the rendering and billing of the initial examinations remained intact when

Dr. Boppana and Queens Medical performed, or purported to perform, the initial examinations at the Northern Boulevard Clinic.

140.    The initial examinations were performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol designed solely to maximize profits, pursuant to the improper referral arrangements, and to provide Insureds with predetermined diagnoses to allow the PC Defendants to then provide a host of medically unnecessary or illusory services.

141.    The initial examinations, in fact, were form documents with check boxes and pre-printed choices which the examining doctor would circle, with few other comments or narration beyond the markings in boxes or circling of pre-printed diagnoses/symptoms.

142.    In keeping with the fact that Dr. Boppana and Queens Medical continued the same fraudulent treatment and billing protocol, the initial examination forms used by Northern Medical and Queens Medical are identical.

143.    The Medical PC Defendants virtually always billed GEICO for initial examinations performed by Northern Medical and Queens Medical under current procedural terminology ("CPT") code 99205, typically representing a 60-minute examination and resulting in a charge of $200.68.

144.    The charges for the initial examinations were fraudulent in that the examinations were medically unnecessary and were performed pursuant to the fraudulent treatment protocols and improper referral and financial arrangements between the Defendants.

145.    CPT code 99205 is described in the Fee Schedule, which is applicable to claims for No-Fault Benefits, as:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A comprehensive

history; A <u>comprehensive</u> examination; Medical decision making of <u>high complexity</u>.  Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the presenting <u>problem(s) are of moderate to high severity</u>.  Physicians typically spend <u>60 minutes</u> face-to-face with the patient and/or family. (Emphasis added).

146.    The Medical PC Defendants' charges for the initial examinations were fraudulent in that: (i) the initial examinations were medically unnecessary and were performed pursuant to a fraudulent treatment protocol and improper referral and financial arrangements between the Defendants; (ii) the CPT codes the Medical PC Defendants billed misrepresented the extent of the initial examinations and the nature of the underlying service; (iii) the initial examination reports misrepresented the nature, extent and complexity of the Insureds' injuries; and (iv) the initial examinations virtually never took 60 minutes to perform, to the extent that they were performed at all.

147.    According to the Fee Schedule, the use of CPT code 99205 requires that the Insured presented with problems of moderate-to-high severity.

148.    By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft tissue injuries such as sprains and strains.

149.    Even so, the Medical PC Defendants virtually always billed for the initial examinations under CPT code 99205, and thereby falsely represented that the Insureds presented with problems of moderate-to-high severity.

150.    The Medical PC Defendants routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges for the examinations under CPT code 99205, because examinations billable under this CPT code is reimbursable at a higher rate than examinations involving presenting problems of

lower severity.

151.    The Medical PC Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for the laundry-list of other Fraudulent Services that the PC Defendants purported to provide to the Insureds, including diagnostic testing, chiropractic services, acupuncture services, and physical therapy services.

152.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as a result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

153.    In addition, the use of CPT code 99205 typically requires that the physician spend 60 minutes, respectively, of face-to-face time with the Insured or the Insured's family. Though the Medical PC Defendants virtually always billed for the initial examinations under CPT code 99205, none of the medical professionals associated with the Medical PC Defendants spent 60 minutes with any Insured during the initial examinations.

154.    In keeping with the fact that the initial examinations allegedly provided by the Medical PC Defendants did not entail 60 minutes of face-to-face time with the Insureds or their families, the template examination forms used by the Medical PC Defendants in purporting to conduct the initial examinations set forth a limited range of history and physical examination parameters.

155.    The only face-to-face time between the examining physicians and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient

interviews and limited examinations of the Insureds' musculoskeletal systems. These brief interviews and limited examinations did not entail 60 minutes of face-to-face time with the Insureds or their families.

156.    In their claims for initial examinations, the Medical PC Defendants falsely represented that the examinations involved at least 60 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99205, because examinations billable under this CPT code is reimbursable at a higher rate than examinations that require less time to perform.

157.    When the Medical PC Defendants billed for the initial examinations under CPT code 99205, they falsely represented that the Medical PC Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

158.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the health care provider take a history of virtually all body systems, not only the body systems that are related to the patient's present complaint. A "comprehensive" patient history also requires that the health care provider take a complete past, family, and social history from the patient.

159.    Rather, after purporting to provide the initial examinations, the Medical PC Defendants prepared reports designed solely to support the laundry-list of Fraudulent Services that other PC Defendants purported to provide and then billed to GEICO and other insurers.

160.    Furthermore, the Medical PC Defendants routinely falsely represented that their initial examinations involved "complex" medical decision-making. In actuality, the initial examinations did not involve any such decision-making because the Insureds never presented with injuries or symptoms that would necessitate "complex" decision-making.

29

161.    In the unlikely event that an Insured did present with injuries or symptoms that required "complex" decision-making, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

162.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

163.    First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any significant medical records, diagnostic tests, or other information. When the Insureds presented to the Medical PC Defendants for "treatment," they did so without any medical records.

164.    Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.   In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying them.

165.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the health care services provided by the medical professionals associated with the PC Defendants, to the extent that any such services or treatment options were provided in the first instance.

166.    Third, in virtually every case, the Medical PC Defendants never considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

Rather, to the extent that the initial examinations were conducted in the first instance, the Medical PC Defendants made routine, predetermined "diagnoses" for every Insured, and prescribed a substantially identical course of treatment for every Insured – which included physical therapy, and chiropractic treatment and acupuncture treatment rendered by other health care providers operating from the Northern Boulevard Clinic – without regard to any individual Insured's actual medical condition or needs.

167. In keeping with the fact that the Medical PC Defendants never considered any significant number of diagnoses or treatment options for the patients treating at the Northern Boulevard Clinic, virtually every Insured that treated with Dr. Ahmed and Northern Medical was recommended a diagnostic and therapeutic plan that included the following:

- Physical therapy program four times per week
- Computerized ROM and MMT Examination
- Outcome Assessment Test
- Physical Capacity Test

168. Likewise, for the vast majority of the Insureds that treated with Dr. Boppana and Queens Medical, the following recommendations were made:

- Bed Rest
- Avoid Physical Activity
- Physical therapy three to four times per week
- Computerized ROM and MMT Examination
- Outcome Assessment Test
- Physical Capacity Test
- Chiropractic referral
- Acupuncture referral

169. Clearly, despite the fact that the Medical PC Defendants virtually always billed for their putative initial examinations using CPT code 99205, and thereby falsely represented that the initial examinations involved "complex" medical decision-making, the initial examinations did not involve any legitimate medical decision-making at all.

170.    Rather, to the extent that the initial examinations were conducted in the first instance, the Medical PC Defendants made boilerplate, predetermined "diagnosis" for Insureds, and prescribed a virtually identical course of extensive and unnecessary treatment for each Insured.

171.    In the claims for initial examinations, the Medical PC Defendants falsely represented that the initial examinations involved "complex" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99205 because this CPT code is reimbursable at a higher rate than examinations that do not require "complex" medical decision-making.

172.    Additionally, the vast majority of the Insureds purportedly examined by Dr. Ahmed and Northern Medical were reported to be suffering from either "mild disability" with the impairment measured at 25-49% or a "moderate disability" with the impairment measured at 50-74%. Similarly, the vast majority of the Insureds purportedly examined by Dr. Boppana and Queens Medical were reported to be suffering from either a "moderate disability" with the impairment measured at 50-74% or "marked disability" with the impairment measured at 75-99%, or total disability.

173.    These observations by the Medical PC Defendants further support the fact that (i) the initial examinations were not medically unnecessary in the first instance; (ii) the Medical PC Defendants misrepresented the extent of the initial examinations and the nature of the underlying service; (iii) the initial examination reports misrepresented the nature, extent and complexity of the Insureds' injuries in order to justify additional fraudulent billing for additional Fraudulent Services; and (iv) the initial examinations were performed pursuant to the fraudulent treatment protocols and improper referral and financial arrangements between the Defendants.

    2.      **The Fraudulent Follow-Up Examinations by Northern Medical and Queens Medical**

174.    In addition to the fraudulent initial examinations, in an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Medical PC Defendants typically purported to subject the Insureds in Exhibits "1" and "2" to one or more fraudulent follow-up examinations pursuant to the fraudulent treatment protocol and improper referral and financial arrangements between the Defendants.

175.    From October 2014 through August 2017, Dr. Ahmed performed, or purported to perform, the follow-up examinations at the Northern Boulevard Clinic through Northern Medical.

176.    In July 2017, as Dr. Ahmed and Northern Medical ceased providing follow-up examinations to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical began to perform, or purport to perform, the follow-up examinations on new patients at the Northern Boulevard Clinic.

177.    In keeping with the fact that the lease agreements between the Subleasing PC Defendants and Mayzenberg and Boruch Laosan were sham agreements, Dr. Ahmed and Northern Medical continued to purportedly provide follow-up examinations to Insureds after Dr. Boppana and Queens Medical purportedly began leasing space and performing follow-up examinations at the Northern Boulevard Clinic.

178.    The fraudulent treatment protocols established by Dr. Ahmed and Northern Medical surrounding the rendering and billing of the follow-up examinations remained intact when Dr. Boppana and Queens Medical performed, or purported to perform, the follow-up examinations at the Northern Boulevard Clinic.

179.    Like the initial examinations, the follow-up examinations were fraudulent in that

they were performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol designed solely to maximize profits, pursuant to the improper referral and financial arrangements between the Defendants, and to provide Insureds with predetermined diagnoses to allow the PC Defendants to then provide a host of medically unnecessary or illusory services.

180.    Virtually all of the follow-up examinations allegedly performed by the Medical PC Defendants were billed to GEICO under CPT codes 99214 or 99215, typically resulting in a charge of $92.97 or $148.69, respectively, with the vast majority submitted under CPT code 99215.

181.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

182.    According to the Fee Schedule, the use of CPT codes 99214 and 99215 typically requires that the Insured present with problems of "moderate to high severity."  As previously stated, the Insureds never presented with problems of this severity, and if they did, the deficient follow-up examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

183.    In the claims for follow-up examinations, the Medical PC Defendants, in an effort to maximize profits without regard for genuine patient care, routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99214 and 99215, because follow-up examinations billable under CPT codes 99214 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity.

184.    The Medical PC Defendants also routinely falsely represented that the Insureds

presented with problems of moderate to high severity in order to create a false basis to continue referring Insureds for the laundry-list of other Fraudulent Services that the PC Defendants purported to provide to the Insureds, including diagnostic testing, chiropractic services, acupuncture services and physical therapy services rendered through the PC Defendants.

185.    Additionally, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family and CPT code 99215 typically requires that the physician spend 40 minutes of face-to-face time with the Insured or the Insured's family.

186.    Though the Medical PC Defendants routinely billed for the follow-up examinations using CPT code 99214 and 99215, no physician associated with the Medical PC Defendants ever spent 10 minutes, let alone 25 or 40 minutes of face-to-face time with the Insureds or their families during the follow-up examinations.

187.    In their claims for follow-up examinations, the Medical PC Defendants falsely represented that the examinations involved at least 25 or 40 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99214 and 99215, because examinations billable under CPT codes 99214 and 99215 are reimbursable at a higher rate than examinations that require less time to perform.

188.    In keeping with the fact that none of the medical professionals associated with the Medical PC Defendants ever spent 25 or 40 minutes of face-to-face time with the Insureds and/or the Insureds' families, the Medical PC Defendants used pre-printed checklist or template forms in conducting the follow-up examinations.

189.    In addition, when the Medical PC Defendants submitted charges for the follow-up examinations under CPT code 99214, they falsely represented that they performed at least two of

the following three components: (i) took a detailed patient history; (ii) conducted a detailed physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

190.    When the Medical PC Defendants submitted charges for the follow-up examinations under CPT code 99215, they falsely represented that they performed at least two of the following three components: (i) took a comprehensive patient history; (ii) conducted a comprehensive physical examination; and (iii) engaged in medical decision-making of "high complexity."

191.    During the purported follow-up evaluation, no physician associated with the Medical PC Defendants took a "detailed" patient history or "comprehensive" patient history.

192.    Furthermore, during the purported follow-up evaluation, no physician associated with the Medical PC Defendants conducted a "detailed" or "comprehensive" patient examination.

193.    What is more, during the purported follow-up examinations, no physician associated with the Medical PC Defendants engaged in medical decision-making of moderate or high complexity.

194.    In actuality, the follow-up examinations did not involve any such decision-making because the Insureds never presented with injuries or symptoms that would necessitate decision making of moderate to high complexity.  In the unlikely event that an Insured did present with such injuries or symptoms, the deficient follow-up examinations were incapable of assessing and/or diagnosing them as such.

195.    In keeping with the fact that the follow-up examinations did not involve any such decision-making, the Medical PC Defendants regularly prescribed the same exact physical therapy modalities for each Insured.

196.    Additionally, in most cases the Medical PC Defendants did not actually provide any legitimate follow-up examinations at all, and compiled phony boilerplate "follow-up examination" reports to support their fraudulent treatment and billing protocol.

197.    The phony "follow-up examination" reports that the Medical PC Defendants compiled falsely suggested that the Insureds continued to suffer from injuries sustained in automobile accidents, and required additional Fraudulent Services in order to complete their recovery.

198.    In keeping with the fact that the follow-up examinations were purportedly completed in order to support the laundry-list of Fraudulent Services provided by the PC Defendants, the Insured's prognosis after the follow-up examination was often left blank by the Medical PC Defendants.

199.    In the claims for follow-up examinations, the Medical PC Defendants falsely represented that the examinations included a detailed or comprehensive patient history, a detailed or comprehensive physical examination, and medical-decision making of moderate to high complexity because follow-up examinations billable under CPT codes 99214 and 99215 are reimbursable at higher rates than less-detailed examinations.

200.    These phony follow-up examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to continue to support the laundry-list of Fraudulent Services that the PC Defendants purported to perform and then billed to GEICO and other insurers.

**3.    The Fraudulent Computerized Range of Motion Testing by Northern Medical and Queens Medical**

201.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Medical PC Defendants, purported to subject the vast majority of Insureds in Exhibits "1" and "2" to medically unnecessary computerized range of motion testing ("ROM").

202.    From October 2014 through August 2017, Dr. Ahmed performed, or purported to perform, the ROM at the Northern Boulevard Clinic through Northern Medical.

203.    In June 2017, as Dr. Ahmed and Northern Medical ceased providing ROM to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical began to also perform, or purport to perform, the ROM to new patients at the Northern Boulevard Clinic.

204.    In keeping with the fact that the lease agreements between the Subleasing PC Defendants and Mayzenberg and Boruch Laosan were sham agreements, Dr. Ahmed and Northern Medical continued to purportedly provide ROM to Insureds after Dr. Boppana and Queens Medical purportedly leased space and began to perform ROM at the Northern Boulevard Clinic.

205.    Like the medical examinations, despite the fact that Queens Medical began billing for the ROM at the Northern Boulevard Clinic, the fraudulent treatment protocols surrounding the rendering and billing of the ROM remained intact.

206.    Like the charges for the other Fraudulent Services, the charges submitted by the Medical PC Defendants for the ROM were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol designed solely to maximize profits and pursuant to the improper referral and financial arrangements between the Defendants.

207.    The charges for the ROM were also fraudulent in that the ROM was improperly billed separately from the medical examinations to maximize the billing submitted and was medically unnecessary.

### a. Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength

208.    The adult human body is made up of 206 bones joined together at various joints that are either of the fixed, hinged, or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a knee, rotate a shoulder, or move the neck to one side.

209.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion."  Stated in a more illustrative way, range of motion is the degree of movement at the joint.

210.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the limb actively or passively is moved around the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

211.    Physical evaluations performed on patients with soft-tissue trauma include range of motion tests, inasmuch as these tests provide a reference point for injury assessment and treatment planning. Unless a physician knows the extent of a given patient's joint or muscle strength impairment, it will substantially limit the ability to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" evaluation of a trauma patient.

212.    Since range of motion tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion tests are to be reimbursed as an element of the initial and follow-up examinations.

213.    In other words, health care providers cannot conduct and bill for initial examinations and follow-up examinations, then bill separately for contemporaneously-provided range of motion tests.

### a. The ROM was Improperly Billed for Separately from the Medical Examinations and was Clinically Useless in the Manner Employed by the Medical PC Defendants

214.    To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Northern Boulevard Clinic from the Medical PC Defendants that were billed to GEICO, the Insureds also received manual range of motion tests during those examinations.

215.    The charges for the manual range of motion tests were part and parcel of the charges that the Medical PC Defendants routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

216.    Despite the fact that the Medical PC Defendants knew that the Insureds already purportedly had undergone manual range of motion testing during their initial examinations and follow-up examinations – because the Medical PC Defendants purported to perform them – the Medical PC Defendants systemically billed for, and purported to provide, ROM to Insureds.

217.    However, while the Medical PC Defendants purportedly manually tested the Insureds' range of motion during the initial examinations and follow-up examinations, the Medical PC Defendants intentionally provided deficient medical examinations by failing to document the specific degree of movement during the initial examinations and follow-up examinations.

218.    In connection with the intentional failure to document the Insureds' degree of movement during the initial and follow-up examinations, the Medical PC Defendants then submitted billing for the ROM under separate charges to maximize profits without regard for genuine patient care.

219.    Similarly, there are many instances where the Medical PC Defendants purportedly performed ROM on an Insured within one week of either the Insured's initial examination or follow-up examination.

220.    By intentionally failing to document the Insureds' degree of movement during the examinations, the Medical PC Defendants "unbundled" and fraudulently inflated the charges for range of motion testing through the billing for ROM.

221.    In addition to unbundling the charges for range of motion testing to fraudulently inflate the charges that they submitted to GEICO, the ROM was also clinically useless in the manner employed by the Medical PC Defendants.

222.    In keeping with the fact that the ROM was clinically useless in the manner employed by the Medical PC Defendants, the purported results of the ROM were never incorporated into the Insureds' treatment plans, nor were the Insureds' treatment plans ever assessed or modified based on the purported results of the ROM.  Rather, the PC Defendants

continued to operate pursuant to the fraudulent predetermined treatment and testing protocol, regardless of the Insureds' individual symptoms or actual response to the purported treatment.

223.    The ROM was rendered pursuant to a predetermined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**b.  The Fraudulent Computerized Range of Motion and Muscle Strength Testing**

224.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, the Medical PC Defendants also purported to subject Insureds to medically unnecessary ROM and computerized muscle strength testing ("ROM/MT"), often times near the dates on which the Medical PC Defendants purported to provide the initial examinations and follow-up examinations.

225.    Dr. Ahmed and Northern Medical submitted bills to GEICO for ROM/MT billed as multiple separate charges under CPT code 95851 seeking reimbursement of $45.71 per charge for the ROM, and as multiple separate charges under CPT code 95831 seeking reimbursement of $43.60 for the MT.

226.    Beginning in July 2017, Dr. Boppana and Queens Medical submitted bills to GEICO for ROM/MT billed as multiple separate charges under CPT code 95851 and seeking reimbursement of $45.71 per charge for the ROM, and as multiple separate charges under CPT code 95831 and seeking reimbursement of $43.60 for the MT.

227.    Like the Medical PC Defendants' charges for the other Fraudulent Services, the charges for the ROM/MT were fraudulent in that: (i) the ROM/MT were medically unnecessary; (ii) the ROM/MT was performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocols and the improper referral

and financial arrangements.

     **c.  The Medical PC Defendants' Duplicate Billing for Medically Unnecessary ROM/MT**

228.    To the extent that the Medical PC Defendants actually provided the initial examinations and follow-up examinations that were billed to GEICO, the Medical PC Defendants provided manual range of motion tests and manual muscle strength tests to each Insured during the examinations.

229.    The charges for the manual range of motion and manual muscle strength tests were part and parcel of the CPT codes that the Medical PC Defendants routinely submitted or caused to be submitted for the initial examinations and follow-up examinations billed.

230.    Despite the fact that the Medical PC Defendants knew that the Insureds already purportedly had undergone manual range of motion and muscle testing during their examinations, and despite the fact that the Medical PC Defendants knew that reimbursement for range of motion and muscle testing already had been submitted to GEICO as a component of reimbursement for the examinations, the Medical PC Defendants billed for, and purported to provide, ROM/MT to Insureds separate and apart from the ROM/MT performed during the initial and follow-up examinations.

231.    Though the Insureds purportedly underwent follow-up examinations at the Northern Boulevard Clinic, the Medical PC Defendants routinely deliberately scheduled separate appointments for ROM/MT so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

232.    In the instances where ROM/MT was purportedly performed, the Medical PC Defendants purported to provide the ROM by placing a digital inclinometer or goniometer on

various parts of the Insureds' bodies while the Insured was asked to attempt various motions and movements. The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each evaluation, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion. Then, the Medical PC Defendants purported to provide the MT by placing a strain gauge-type measurement apparatus against a stationary object, against which the Insured was asked to press three-to-four separate times using various muscle groups. As with the ROM, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and follow-up examinations – except that a digital printout was obtained.

233. The information gained through the use of the ROM/MT was not significantly different from the information obtained through the manual testing that was part and parcel of each Insured's initial and follow-up examinations. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing was meaningless.

234. While ROM/MT can be a medically useful tool as part of a research project, under the circumstances employed by the Medical PC Defendants, it represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

235. The ROM/MT were part and parcel of Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to

financially enrich Defendants.

**d.  The Medical PC Defendants' Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Strength Tests**

236.   Not only did the Medical PC Defendants deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle strength tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO.

237.   Pursuant to the Fee Schedule, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

238.   CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes", identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas.  These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation.  They also include creation of a written report.

239.   CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed.  Thus, if a provider performed 15 minutes of ROM/MT, it would be permitted a single charge of $45.71 for the ROM/MT under CPT code 97750.  If the provider performed 30 minutes of ROM/MT, it would be permitted to submit two charges of $45.71 for the ROM/MT under CPT code 97750, resulting in total charges of $91.42, and so forth.

240.   The Medical PC Defendants routinely purported to provide ROM/MT to Insureds

on the same dates of service.

241.   To the extent that the Medical PC Defendants actually provided the ROM/MT to Insureds in the first instance, the ROM/MT – together – never took more than 15 minutes to perform.  Thus, even if the ROM/MT that the Medical PC Defendants purported to provide were medically necessary, and were performed in the first instance, the Medical PC Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed ROM/MT on an Insured.

242.   In order to maximize their fraudulent billing for the computerized range of motion and muscle strength tests, the Medical PC Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and muscle strength testing into: (i) multiple charges of $45.71 under CPT code 95851 (for the ROM); and (ii) multiple charges of $43.60 under CPT code 95831(for MT).

243.   By unbundling what should – at most – have been two charges of $45.71 under CPT code 97750 into multiple charges under CPT codes 95851 and 95831, the Medical PC Defendants typically inflated the fraudulent ROM/MT charges that they submitted to GEICO by an order of magnitude.  Dr. Ahmed and Northern Medical submitted billing for ROM/MT rendered to an Insured on a single date of service for amounts ranging from $270.04 to $583.68, while Dr. Boppana and Queens Medical submitted billing for ROM/MT rendered to an Insured on a single date of service for amounts ranging from $87.20 to $583.68 per patient, with the majority of patients that received ROM/MT receiving multiple rounds of the testing.

> **e.   The Medical PC Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the ROM/MT**

244.   Not only were the Medical PC Defendants' charges for the ROM/MT fraudulent because the tests were duplicative and medically unnecessary, the charges were also fraudulent

because they falsely represented that the Medical PC Defendants prepared written reports interpreting the test data.

245. Pursuant to the Fee Schedule, when a health care provider submits a charge for computerized range of motion testing using CPT code 95851 or for computerized muscle strength testing using CPT code 95831, the provider represents that it has prepared a written report interpreting the data obtained from the test.

246. The American Medical Association's CPT Assistant (the "CPT Assistant") states that "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851 and 95852".

247. The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95831 to charge for muscle strength testing.

248. Though the Medical PC Defendants submitted bills for the computerized range of motion and muscle strength tests using CPT codes 95831and 95851, the Medical PC Defendants did not prepare written reports interpreting the data obtained from the tests.

249. Therefore, even if the Medical PC Defendants had satisfied the other requirements to submit their billing for ROM/MT under CPT codes 95831 and 95851 – and they did not – the Medical PC Defendants' billing still would not be in compliance with the Fee Schedule due to a failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported ROM/MT for any of the Insureds.

250. The Medical PC Defendants did not prepare written reports interpreting the data obtained from the ROM/MT tests because the tests were not meant to impact any Insured's

course of treatment. Rather, to the extent they were performed at all, the ROM/MT were performed as part of the Defendants' predetermined fraudulent billing and treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

### 4.     The Fraudulent Physical Performance Testing by Northern Medical and Queens Medical

251.    From October 2014 through August 31, 2017, in an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Dr. Ahmed and Northern Medical purported to subject the vast majority of the Insureds in Exhibit "1" to medically useless physical performance testing ("PPT"), often times near the dates on which Dr. Ahmed and Northern Medical purported to provide the initial examinations and follow-up examinations.

252.    Beginning in June 2017, as Dr. Ahmed and Northern Medical ceased providing PPT to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical continued the fraudulent treatment protocol by purporting to subject the vast majority of the Insureds in Exhibit "2" to PPT, often times near the dates on which Dr. Boppana and Queens Medical purported to provide the initial examinations and follow-up examinations.

253.    In keeping with the fact that the lease agreements between the Subleasing PC Defendants and Mayzenberg and Boruch Laosan were sham agreements, Dr. Ahmed and Northern Medical continued to purportedly provide PPT to Insureds after Dr. Boppana and Queens Medical purportedly leased space and began to perform PPT at the Northern Boulevard Clinic.

254.    Like the other Fraudulent Services, despite the fact that Queens Medical began billing for the PPT at the Northern Boulevard Clinic, the fraudulent treatment protocols

surrounding the rendering and billing of the PPT remained intact.

255.    In keeping with the fact that the Defendants' fraudulent treatment protocol for the PPT continued under Dr. Boppana and Queens Medical, Haengyeol Heo purportedly provided PPT to the Insureds at the Northern Boulevard Clinic for Northern Medical and thereafter Queens Medical.

256.    The Medical PC Defendants' charges for the PPT were also fraudulent in that the PPT were medically unnecessary, and the Medical PC Defendants unbundled the charges for the PPT to fraudulently inflate the charges for the PPT that they submitted to GEICO by an order of magnitude.

257.    The Medical PC Defendants provided deficient initial and follow-up examinations by failing to document anything regarding the degree of movement for the Insureds' manual muscle strength during the initial examinations and follow-up examinations.

258.    By intentionally failing to document the Insureds' manual muscle strength during the initial and follow-up examinations, the Medical PC Defendants were seemingly able to submit the billing for the PPT under separate charges to maximize profits without regard for genuine patient care.

259.    Not only did the Medical PC Defendants deliberately purport to provide medically unnecessary PPT, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit to GEICO. The Medical PC Defendants, pursuant to the fraudulent treatment and billing protocol designed solely to maximize profits, unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for 15 minutes of testing that is performed.  CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that

is performed. CPT code 97750 does not permit multiple, independent charges for PPT on various extremities or body parts.

260.     Even so, the Medical PC Defendants unbundled their charges for PPT for virtually every Insured by submitting multiple, independent charges for PPT on various extremities or body parts. The Medical PC Defendants routinely submitted independent charges for PPT of the Insureds' arms, legs, torso, and for performing various lifts, rather than on the basis of time spent purportedly providing PPT. Through this fraudulent billing protocol, the Medical PC Defendants inflated the charges they submitted to GEICO for each distinct session of PPT for the vast majority of Insureds by submitting six separate charges for CPT code 97750 and a total billing of $249.96 for what should have been – at most – a single charge of $45.71.

261.     In addition to unbundling the charges for the PPT to fraudulently inflate the charges that they submitted to GEICO, the PPT was also clinically useless in the manner employed by the PC Defendants.

262.     In keeping with the fact that the PPT were medically useless, and provided – to the extent they were provided at all – solely for financial gain, the purported results of the PPT were never incorporated into the Insureds' treatment plans, nor were the Insureds' treatment plans ever assessed or modified based on the purported results of the PPT. Rather, the PC Defendants continued to operate pursuant to the fraudulent predetermined treatment and testing protocol, regardless of the Insureds' individual symptoms or actual response to the purported treatment.

263.     Additionally, the charges submitted by the Medical PC Defendants for the PPT under CPT code 97750 were fraudulent because they falsely represented that the Medical PC

Defendants prepared written reports interpreting the test data and documenting the total time spent with the patient.

264.    Pursuant to the Fee Schedule, when a health care provider submits a charge for testing using CPT code 97750, the provider represents that it has prepared a written report (i) interpreting the data obtained from the test; (ii) documenting the total time spent with the patient; and (iii) documenting the impact of the testing on the patient's plan of care.

265.    The CPT Assistant states that "As code 97750 is a time-based code, the test or measurement procedure as well as the time spent analyzing and interpreting the results in the presence of the patient are elements of the visit that must be documented."

266.    The CPT Assistant also states that "[t]hree time elements must be documented to correctly report code 97750:

- Total time spent with the patient in providing the test and measurement, including the time spent preparing the patient for the test and measurement procedure;
- The time spent performing the selected protocol; and
- The time spent with the patient in providing any post-testing instructions."

267.    The CPT Assistant also states that "[t]he elements of documentation that support the reporting of code 97750, include documentation of the testing elements and/or protocols, documentation and interpretation of the data collected, and impact on the patient's plan of care (i.e., discharge, return to sport or activities of daily living (ADL), or modification of treatment)."

268.    Though the Medical PC Defendants routinely submitted billing for the PPT using CPT code 97750, the Medical PC Defendants did not prepare written reports interpreting the results of the purported PPT tests, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

269.    Therefore, even if the Medical PC Defendants had satisfied the other requirements

to submit their billing for PPT under CPT code 97750 – and they did not – the Medical PC Defendants' billing still would not be in compliance with the Fee Schedule due to a failure to submit a separate, distinctly identifiable, and signed written report interpreting the results of the purported PPT, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care.

270.    The Medical PC Defendants did not prepare written reports interpreting the data obtained from the tests, documenting the three required time elements, or documenting how the results would impact the Insureds' plan of care because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the PPT were performed as part of the Defendants' predetermined fraudulent treatment and billing protocols, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

271.    In keeping with the fact that the PPT was rendered pursuant to a predetermined treatment protocol, virtually every Insured was referred for "Physical Capacity Test" by the Medical PC Defendants during the initial examination.

272.    The PPT were simply another component of the Defendants' fraudulent predetermined treatment and billing protocols, which permitted them to submit, or cause to be submitted bills for hundreds of dollars per Insured for each PPT allegedly provided.

**5.      The Fraudulent "Outcome Assessment Testing" by Northern Medical and Queens Medical**

273.    From September 2014 through September 2017, in an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Dr. Ahmed and Northern Medical purported to subject the vast majority of the Insureds in Exhibit "1" to medically useless "outcome assessment testing" ("OAT").

274. In June 2017, as Dr. Ahmed and Northern Medical ceased providing OAT to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical continued the fraudulent treatment protocol by purporting to subject the vast majority of the Insureds in Exhibit "2" to OAT.

275. In keeping with the fact that the lease agreements between the Subleasing PC Defendants and Mayzenberg and Boruch Laosan were sham agreements, Dr. Ahmed and Northern Medical continued to purportedly provide OAT to Insureds after Dr. Boppana and Queens Medical purportedly leased space and began to perform OAT at the Northern Boulevard Clinic.

276. Like the PPT, despite the fact that the billing for OAT transitioned from Northern Medical to billing the testing under Queens Medical, the fraudulent treatment protocols surrounding the rendering and billing of the OAT remained intact.

277. Like the charges for the other Fraudulent Services, the charges submitted by the Medical PC Defendants for the OAT were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocols designed solely to maximize profits and pursuant to the improper referral and financial arrangements.

278. The Medical PC Defendants billed the OAT to GEICO under CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

279. The OAT that the Medical PC Defendants purported to provide to the Insureds were simply pre-printed questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily activities.

280.     Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the OAT that the Medical PC Defendants purported to provide were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the OAT should be reimbursed as an element of the initial examinations and follow-up examinations.

281.     Accordingly, health care providers cannot conduct and bill for an initial examination or follow-up examination, and then bill separately for contemporaneously-provided OAT.

282.     Even so, the Medical PC Defendants routinely submitted multiple charges for OAT for each Insured to GEICO that were independent from and in addition to the charges for their purported initial examinations and follow-up examinations.

283.     Furthermore, the information gained through the use of the numerous OAT that the Medical PC Defendants purported to provide to the Insureds was not significantly different from the information that the Medical PC Defendants purported to obtain during the patient histories and examinations purportedly conducted during the Insureds' initial examination and follow-up examinations.

284.     Under the circumstances employed by the Medical PC Defendants, the numerous OAT purportedly provided to the Insureds represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examination and follow-up examinations. The OAT were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a predetermined protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

285.    The Medical PC Defendants' use of CPT code 99358 to bill for the OAT also constitutes a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as review of extensive records and tests, or communication with the patient and his or her family.

286.    Though the Medical PC Defendants routinely submitted multiple charges for OAT for each Insured under CPT code 99358, no physician ever spent an hour reviewing or administering the tests.

287.    In fact, the OAT did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

288.    In keeping with the fact that the OAT were medically useless, and provided – to the extent they were provided at all – solely for financial gain, the purported results of the OAT were never incorporated into the Insureds' treatment plans, nor were the Insureds' treatment plans ever assessed or modified based on the purported results of the OAT. Rather, the PC Defendants continued to operate pursuant to the fraudulent predetermined treatment and testing protocols, regardless of the Insureds' individual symptoms or actual response to the purported treatment.

289.    Nevertheless, Dr. Ahmed and Northern Medical and Dr. Boppana and Queens Medical each submitted billing to GEICO for tens of thousands of dollars in fraudulent billing under CPT code 99358, solely for financial gain.

### 6.    The Fraudulent Neurological Examinations and Electrodiagnostic Tests at Northern Medical and Queens Medical

290.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Dr. Ahmed and Northern Medical and Dr. Boppana and Queens

Medical purported to subject many of the Insureds in Exhibit "1" and Exhibit "2" to a series of medically unnecessary neurological examinations, followed by electromyography ("EMG") tests and nerve conduction velocity ("NCV") tests (collectively the "electrodiagnostic" or "EDX" tests)

291.    From October 2014 through June 2017, Dr. Ahmed and Northern Medical purported to subject Insureds at the Northern Boulevard Clinic to EDX tests.

292.    In July 2017, as Dr. Ahmed and Northern Medical ceased providing EDX tests to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical continued the fraudulent treatment protocol.

293.    Like the other Fraudulent Services, despite the fact that EDX tests transitioned from Northern Medical to Queens Medical, the fraudulent treatment protocols surrounding the rendering and billing of the EDX tests remained intact.

294.    Like the charges for the other Fraudulent Services, the charges submitted by the Medical PC Defendants for the EDX testing were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocols designed solely to maximize profits and pursuant to the improper referral and financial arrangements.

295.    The Medical PC Defendants routinely submitted thousands of dollars in fraudulent billing for each Insured to whom they purported to provide the medically unnecessary neurological examinations and EDX tests.

296.    As set forth in Exhibit "1" and Exhibit "2", the Medical PC Defendants' neurological examinations and EMG and NCV tests routinely resulted in charges in excess of

$3,000.00 for each Insured to whom the neurological examinations and EDX testing purportedly was provided.

### a. The Fraudulent Neurological Examinations

#### i. Dr. Ahmed and Northern Medical's Fraudulent Neurological Examinations

297.    Prior to providing EDX tests, Dr. Ahmed and Northern Medical purported to perform a neurological examination billed as an "Office Visit" under CPT code 99243 on virtually all of the Insureds, typically resulting in a charge of $181.22.

298.    The charges for the neurological examinations were fraudulent in that the examinations were medically unnecessary, were performed – to the extent that they are performed at all – pursuant to Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds, and were performed pursuant to the improper referral and financial arrangements amongst the Defendants.

299.    In the claims for the neurological examinations identified in Exhibit "1", the charges for the purported neurological examinations also were fraudulent in that they misrepresented the nature and extent of the neurological examinations.

300.    In addition, pursuant to the Fee Schedule, when Dr. Ahmed and Northern Medical submitted charges for examinations under CPT codes 99243, they falsely represented that a physician associated with Dr. Ahmed and Northern Medical: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity".

#### ii. Misrepresentations Regarding the Performance of "Consultations"

301. Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for a neurological examination represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

302. However, Dr. Ahmed and Northern Medical did not provide their purported neurological examination – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the putative neurological examinations were performed in the first instance, they were performed solely as part of Defendants' fraudulent treatment protocol, in order to generate billing for the PC Defendants.

303. In keeping with the fact that Dr. Ahmed and Northern Medical did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative neurological examination are not transmitted back to any referring physicians.

304. In fact, Dr. Ahmed and Northern Medical purported to perform "consultations" on the Insureds that were already purportedly receiving treatment from Dr. Ahmed and Northern Medical.

305. Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultation in the first instance.

306. However, Dr. Ahmed and Northern Medical did not submit any written consultation report to any referring physician or other health care provider because Dr. Ahmed and Northern Medical purported to perform these neurological examinations – that were improperly billed as consultations – on their own patients.

307.    In the claims for purported neurological examinations identified in Exhibit "1", Dr. Ahmed and Northern Medical misrepresented the underlying services to be consultations billable under CPT code 99243 because such consultations are reimbursable at a higher rate than commensurate, less complex patient examinations.

### iii. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

308.    What is more, in the claims for the neurological examinations under CPT code 99243 that are identified in Exhibit "1", Dr. Ahmed and Northern Medical misrepresented the severity of the Insureds' presenting problems.

309.    Pursuant to the CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99243 to bill for a patient encounter generally requires that the Insured present with problems of moderate severity.

310.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderate to highly severe, and thereby justify the use of CPT code 99243 to bill for a consultation.

311.    Pursuant to the CPT Assistant, the moderate to highly severe presenting problems that could support the use of CPT code 99243 to bill for a consultation typically are chronic and relatively serious problems.

312.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

313.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, to the limited extent that the Insureds in the claims

identified in Exhibit "1" experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

314. The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

315. Even so, in the claims for their purported neurological examinations identified in Exhibit "1", Dr. Ahmed and Northern Medical virtually always billed for the putative neurological examinations using CPT code 99243, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

316. In the claims for the purported neurological examinations identified in Exhibit "1", Dr. Ahmed and Northern Medical falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for their charges for the putative neurological examinations under CPT code 99243, because examinations billable under CPT code 99243 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

317. In the claims for purported neurological examinations identified in Exhibit "1", Dr. Ahmed and Northern Medical also falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for the other Fraudulent Services that the PC Defendants purport to provide to the Insureds, including EDX tests.

### iv. Misrepresentations Regarding the Amount of Time Spent on the Neurological Examinations

318. What is more, in every claim identified in Exhibit "1" for purported neurological examinations under CPT code 99243, Dr. Ahmed and Northern Medical misrepresented and exaggerated the amount of face-to-face time that the examining physicians spent with the Insureds or the Insureds' families.

319.    Pursuant to the Fee Schedule, the use of CPT code 99243 to bill for a neurological examination typically requires that the examining physician spend 40 minutes of face-to-face time with the Insured or the Insured's family during the examination.

320.    Though Dr. Ahmed and Northern Medical routinely billed for the neurological examination under CPT code 99243, no health care provider ever spent 20 minutes on the neurological examination, much less 40 minutes.  Rather, the neurological examinations rarely lasted more than 10 minutes, to the extent that they were conducted at all.

321.    In keeping with the fact that the neurological examinations never lasted more than 10 minutes—to the extent that they were conducted at all—Dr. Ahmed and Northern Medical used pre-printed, checklist forms in purporting to conduct the putative neurological examinations.

322.    The checklist forms that Dr. Ahmed and Northern Medical used in purporting to conduct the neurological examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

323.    All that is required to complete the checklist examination forms is a brief patient interview and a perfunctory physical examination of the Insureds, consisting of basic range of motion, muscle strength, and neurological testing.

324.    These interviews and examinations did not require Dr. Ahmed and Northern Medical to spend more than 10 minutes of face-to-face time with the Insureds or their families during the putative neurological examinations, to the extent that they actually were performed in the first instance.

325.     In the claims for the neurological examinations identified in Exhibit "1", Dr. Ahmed and Northern Medical falsely represented that the putative neurological examinations involved at least 40 minutes of face-to-face time with the Insureds or their families, because examinations that entail at least 40 minutes of face-to-face time with the Insureds or their families are reimbursable at higher rates than examinations that require less time to perform.

### v. Misrepresentations Regarding "Detailed" Patient Histories

326.     When Dr. Ahmed and Northern Medical billed for the consultations under CPT code 99243, they falsely represent that a physician takes a "detailed" patient history from the Insureds.

327.     Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of the patient's present illness related to the patient's presenting problems, as well as a review of a limited number of additional systems.

328.     Pursuant to the Fee Schedule, a "detailed" patient history also requires that the health care provider take a past, family, and social history from the patient to the extent that the patient's past, family, and social history is related to the patient's presenting problems.

329.     However, neither Dr. Ahmed nor any health care provider associated with Northern Medical took a "detailed" patient history from the Insureds during the neurological examinations, inasmuch as they did not take a history of the patient's present illness related to the patient's presenting problems, did not conduct any review of a limited number of additional systems, and did not take a meaningful past, family, and social history from the patient to the extent that the patient's past, family, and social history related to the patient's presenting problems.

330.    Rather, after purporting to provide the neurological examinations, Dr. Ahmed and Northern Medical simply prepared reports containing ersatz patient histories which falsely contend that the Insureds continue to suffer from injuries they sustained in automobile accidents. Even in the unlikely event that an Insured continued to suffer from injuries, there is no adequate neurological history and examination performed to create a foundation for the EDX testing.

331.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead are designed solely to support the Fraudulent Services that the PC Defendants purport to provide and then bill to GEICO and other insurers.

### vi.  Misrepresentations Regarding "Detailed" Physical Examinations

332.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the health care provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

333.    To the extent that the Insureds had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

334.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)  inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

335.   In the claims billed for examinations under CPT code 99243, Dr. Ahmed falsely represented that he, or some other health care provider associated with Northern Medical, conducted a "detailed" patient examination of the Insureds.

336.   In fact, no health care provider associated with Northern Medical conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

### vii. Misrepresentations Regarding the Extent of Medical Decision-Making

337.   In addition, when Dr. Ahmed and Northern Medical submitted charges for neurological examinations under CPT code 99243, they represented that Dr. Ahmed or a health care provider associated with Northern Medical engaged in medical decision-making of "low complexity".

338.    As set forth above, pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

339.    Though Dr. Ahmed and Northern Medical routinely falsely represented that their initial consultations involve medical decision-making of "low complexity" by billing under CPT code 99243, in actuality, the neurological examinations did not involve any medical decision-making at all.

340.    First, the neurological examinations did not involve the retrieval, review, or analysis of any significant medical records or diagnostic tests.

341.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

342.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Dr. Ahmed and Northern Medical, to the extent that Dr. Ahmed and Northern Medical provided any such diagnostic procedures or treatment options in the first instance.

343.    In almost every instance, any diagnostic procedures and "treatments" that Dr. Ahmed and Northern Medical actually provided were limited to a series of medically

unnecessary diagnostic tests or physical therapy, none of which are health or life-threatening if properly administered.

344.    Third, Dr. Ahmed and Northern Medical did not consider any significant number of diagnoses or treatment options for Insureds during the neurological examinations.

345.    Rather, to the extent that the neurological examinations were conducted in the first instance, Dr. Ahmed and Northern Medical provided a predetermined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

346.    In fact, phony examination reports were prepared which reiterated the boilerplate sprain/strain diagnoses that previously had been provided to the Insureds. Based upon these supposed "diagnoses," recommendations that Insureds who purportedly received a neurological examination consultation also receive EDX testing were made simply as a matter of course.

347.    The putative results of the neurological examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that the PC Defendants purported to perform and then bill to GEICO and other New York automobile insurers.

### b. Dr. Boppana and Queens Medical's Fraudulent Neurological Examinations

348.    Prior to providing EDX tests, Dr. Boppana and Queens Medical purported to perform a neurological examination billed as an "Office Visit" under CPT code 99214 on the vast majority of the Insureds, representing a 25 minute examination typically resulting in a charge of $92.97.

349. Dr. Boppana and Queens Medical's charges for the neurological examinations were fraudulent in that they were medically unnecessary, were performed – to the extent that they are performed at all – pursuant to Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds, and were performed pursuant to the improper referral and financial arrangements amongst the Defendants.

350. In the claims for the neurological examinations identified in Exhibit "2", the charges for the purported neurological examinations also were fraudulent in that they misrepresented the nature and extent of the neurological examinations.

351. The charges for Dr. Boppana and Queens Medical's neurological examinations also were fraudulent in that they misrepresented the extent of the examinations.

### i. Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

352. According to the Fee Schedule, the use of CPT code 99214 typically requires that the Insured present with problems of "moderate-to-high severity." As previously stated, the Insureds never presented with problems of this severity, and if they did, the deficient neurological examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

353. In the claims for the neurological examinations, Dr. Boppana and Queens Medical, pursuant to the fraudulent treatment and billing protocol, routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges for the examinations under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity.

354. Dr. Boppana and Queens Medical also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis to continue referring Insureds for the laundry-list of other Fraudulent Services that the PC Defendants purported to provide to the Insureds, including diagnostic testing, chiropractic services, acupuncture services and physical therapy services rendered through the PC Defendants.

355. By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

356. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, to the limited extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

357. The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

358. Even so, for the vast majority of the claims for their purported neurological examinations identified in Exhibit "2", Dr. Boppana and Queens Medical billed for the putative neurological examinations using CPT code 99214, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

359. In the claims for the purported neurological examinations identified in Exhibit "2", Dr. Boppana and Queens Medical falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for their charges for the putative

neurological examinations under CPT code 99214 because examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

360. In the claims for purported neurological examinations identified in Exhibit "2", Dr. Boppana and Queens Medical also falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for the other Fraudulent Services that the PC Defendants purport to provide to the Insureds, including EDX tests.

### ii. Misrepresentations Regarding the Amount of Time Spent on the Neurological Examinations

361. Additionally, CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family. Though Dr. Boppana and Queens Medical routinely billed for the neurological examinations under CPT code 99214, neither Dr. Boppana nor any of the medical professionals associated Queens Medical spent 25 minutes with any Insureds or their families during the neurological examinations.

362. In keeping with the fact neither Dr. Boppana nor any of the medical professionals associated with Queens Medical ever spent 25 minutes of face-to-face time with the Insureds and/or the Insureds' families, Dr. Boppana and Queens Medical used pre-printed checklist or template forms in conducting the neurological examinations.

363. What is more, in keeping with the fact that Dr. Boppana and Queens Medical continued the fraudulent treatment protocol established through Dr. Ahmed and Northern Medical, Dr. Boppana and Queens Medical's neurological examination form is virtually identical to the one used by Dr. Ahmed and Northern Medical.

364. As with Dr. Ahmed and Northern Medical's neurological examination forms, the pre-printed checklist and template forms that Dr. Boppana and Queens Medical used in

conducting the neurological examination set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

365.    All that was required to complete the pre-printed checklist and template forms was a cursory patient history and a very brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

366.    These histories and examinations did not require any physicians associated with Queens Medical to spend more than 10 minutes of face-to-face time with the Insureds during the putative neurological examinations.

367.    In their claims for neurological examinations, Dr. Boppana and Queens Medical, pursuant to the fraudulent treatment and billing protocol, falsely represented that the examinations involved at least 25 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at a higher rate than examinations that require less time to perform.

### iii.    Misrepresentations Regarding "Comprehensive" Patient Histories,

368.    Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

369.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least ten other organ systems.

370.    As set forth above, the CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);
(ii)     eyes;
(iii)    ears, nose, mouth, throat;
(iv)     cardiovascular;
(v)      respiratory;
(vi)     gastrointestinal;
(vii)    genitourinary;
(viii)   musculoskeletal;
(ix)     integumentary (skin and/or breast);
(x)      neurological;
(xi)     psychiatric;
(xii)    endocrine;
(xiii)   hematologic/lymphatic; and
(xiv)    allergic/immunologic.

371.    When Dr. Boppana and Queens Medical billed for the neurological examinations under CPT code 99214, they falsely represented that a physician took a "comprehensive" patient history from the Insureds.

372.    In fact, no health care provider associated with Queens Medical took a "comprehensive" patient history from the Insureds they purported to treat during the examinations, because they did not document a review of ten organ systems unrelated to the history of the patients' present illnesses.

373.    Rather, in purporting to provide the neurological examination, Dr. Boppana and Queens Medical simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents. Even in the unlikely event that an Insured continued to suffer from injuries, there was no adequate neurological history and examination performed to create a foundation for the EDX testing.

374. These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that PC Defendants purported to provide and then billed to GEICO and other insurers.

### iv. Misrepresentations Regarding "Comprehensive" Physical Examinations

375. Moreover, and as set forth above, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the health care provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

376. Though Dr. Boppana and Queens Medical routinely billed for the neurological examinations under CPT codes 99214, and thereby falsely represented that they conducted a "comprehensive" physical examination of Insureds during the neurological examinations, they did not conduct a general examination of multiple organ systems, inasmuch as they did not document findings with respect to at least ten organ systems.

377. As set forth above, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i) at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii) the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii) examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v) examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

### v.   Misrepresentations Regarding the Extent of the Medical Decision-Making

378.   In addition, when Dr. Boppana and Queens Medical submitted charges for neurological examinations under CPT code 99214, they represented that they engaged in medical decision-making of "moderate complexity."

379.   Pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii) review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

380.   Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. In addition, pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed.  Furthermore, pursuant to the CPT Assistant, the

73

risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

381. First, the neurological examinations did not involve the retrieval, review, or analysis of any significant medical records or diagnostic tests.

382. Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

383. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Dr. Boppana and Queens Medical, to the extent that Dr. Boppana and Queens Medical provided any such diagnostic procedures or treatment options in the first instance.

384. In almost every instance, any diagnostic procedures and "treatments" that Dr. Boppana and Queens Medical actually provided were limited to a series of medically unnecessary diagnostic tests or physical therapy, none of which are health or life-threatening if properly administered.

385. Third, Dr. Boppana and Queens Medical did not consider any significant number of diagnoses or treatment options for Insureds during the neurological examinations.

386. Rather, to the extent that the neurological examinations were conducted in the first instance, Dr. Boppana and Queens Medical provided a predetermined "diagnosis" for the Insureds, and prescribe a similar course of treatment for each Insured.

387. In fact, phony examination reports were prepared which reiterated the boilerplate sprain/strain diagnoses that previously had been provided to the Insureds. Based upon these supposed "diagnoses," recommendations that Insureds who purportedly received a neurological

examination consultation also receive EDX testing were made simply as a matter of course.

388.    In keeping with the fact that Dr. Boppana and Queens Medical performed these neurological examinations as a matter of course with the predetermined outcome that the vast majority of the Insureds would receive the EDX testing, Dr. Boppana and Queens Medical also billed for CPT code 99241 for a "Follow Up" for many of the Insureds that purportedly received EDX testing, representing that these Insureds only presented with problems that were "self limited or minor."

389.    What is more, virtually all of these Insureds that presented with problems that were self-limited or minor according to Queens Medical's billing were still referred by Dr. Boppana and Queens Medical for EDX testing.

390.    Dr. Boppana and Queens Medical also misrepresented the treatment when they billed for CPT code 99241 because CPT code 99241 requires "counseling and/or coordination of care with other physicians", and Dr. Boppana and Queens Medical were purportedly performing the "Follow-Up" under CPT code 99241 to determine whether the Insured would then receive EDX testing from Dr. Boppana and Queens Medical, not another physician.

391.    The putative results of the neurological examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that the PC Defendants purported to perform and then bill to GEICO and other New York automobile insurers.

### c.   The Fraudulent Electrodiagnostic Testing

392.    Based upon the fraudulent predetermined "diagnoses" provided during the fraudulent neurological examinations, the Medical PC Defendants purported to subject many of the Insureds in Exhibit "1" and Exhibit "2" to a series of medically unnecessary and useless EDX

tests.

393.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary, often duplicative of other diagnostic nerve testing the Insureds already received, were performed – to the extent that they were performed at all – not to benefit the Insureds who purportedly were subjected to them, and were performed pursuant to the improper referral and financial arrangements amongst the Defendants.

394.    The Medical PC Defendants routinely submitted to GEICO bills on two dates of service, totaling $3,119.44 for Insureds that received EDX testing with Northern Medical or Queens Medical.  The fraudulent EDX tests were billed as follows:

(i)    two units of CPT code 95861, at a rate of $241.50 per unit, for an EMG of the upper and lower extremities;

(ii)    eight units of CPT code 95903, at a rate of $166.47 per unit, for NCV studies of eight motor nerves with F-wave studies;

(iii)    ten units of CPT code 95904, at a rate of $106.47 per unit, for NCV studies of ten sensory nerves; and

(iv)    two units of CPT code 95934, at a rate of $119.99 per unit, for two H-reflex studies.

395.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests (i) were medically unnecessary; and (ii) were performed – to the extent that they were performed at all – pursuant to fraudulent treatment and billing protocol to support the fraudulent charges submitted to New York insurers, including GEICO, in order to financially enrich the Defendants.

396.    Although the Medical PC Defendants purported to provide EDX tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, virtually none of the Insureds actually presented with any symptoms or signs of radiculopathy or any other serious

medical problems arising from any automobile accidents. In the unlikely event that such symptoms or signs did exist, the deficient EMG and NCV tests – to the extent they were performed at all – were incapable of properly identifying them.

397. In actuality, the Medical PC Defendants provided EMG and NCV tests to Insureds as part of the Defendants' predetermined, fraudulent treatment protocol designed to maximize the billing that the PC Defendants could submit to GEICO for each Insured.

### i. The Human Nervous System and Electrodiagnostic Testing

398. The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, extending through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

399. The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerve fibers. They carry electrical impulses throughout the body, to and from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

400. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, atrophy, loss of muscle control, and alteration of reflexes.

401. EMGs and NCVs are forms of electrodiagnostic tests, and purportedly were provided by the Medical PC Defendants because they were medically necessary to determine whether the Insureds have radiculopathies.

402. The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

403. According to the Recommended Policy, the maximum number of NCVs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; and (iii) two H-reflex studies.

404. According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

405. According to the Recommended Policy, NCVs should not be performed without EMGs except in unique circumstances, and the performance of NCV tests without contemporaneous EMG tests can potentially compromise patient care.

### ii. The Fraudulent NCVs

406. NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or

"firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin.

407.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

408.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

409.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

410.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

411.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies. See, Exhibit "5".

412.     In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Medical PC Defendants routinely purported to test far more nerves than recommended by the Recommended Policy.

413.     Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Medical PC Defendants routinely purported to perform: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies.

414.     Therefore, where the Fee Schedule and Recommended Policy would limit billing by the Medical PC Defendants for NCV testing of one Insured to $952.33, representing NCVs of three motor nerves with F-wave studies, NCVs of two sensory nerves, and two H-reflex studies, the Medical PC Defendants routinely submitted NCV billing to GEICO for more than $2,600.00 per Insured.

415.     For instance:

(i)      Dr. Ahmed and Northern Medical submitted one bill on June 18, 2015 and one bill on September 9, 2015 with respect to NCV testing administered to an Insured named "PS", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(ii)     On or about November 3, 2015, Dr. Ahmed and Northern Medical submitted two bills to GEICO with respect to NCV testing administered to an Insured named "CM", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(iii)    Dr. Ahmed and Northern Medical submitted one bill on January 29, 2016 and one bill on March 25, 2016 with respect to NCV testing administered to an Insured named "FM", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3)

two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(iv)     On or about March 28, 2016, Dr. Ahmed and Northern Medical submitted two bills to GEICO with respect to NCV testing administered to an Insured named "VC", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(v)      On or about December 11, 2017, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "MG", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(vi)     On or about December 11, 2017, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "GR", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(vii)    On or about August 20, 2018, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "DA", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(viii)   On or about August 20, 2018, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "AS", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(ix)     On or about October 22, 2018, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "AH", which included (1) eight charges for NCVs with F-

wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(x)   On or about October 30, 2018, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "EF", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

(xi)  On or about December 17, 2018, Dr. Boppana and Queens Medical submitted a bill to GEICO with respect to NCV testing administered to an Insured named "LG", which included (1) eight charges for NCVs with F-wave studies of eight motor nerves totaling $1,331.76; (2) ten charges for NCVs of ten sensory motor nerves totaling $1,064.70; and (3) two charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

416.   These are only representative examples.  The Medical PC Defendants' fraudulent protocol also involved routinely testing the same peripheral nerves and nerve fibers. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

417.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

418.   This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is

dynamic and often changes during the course of the study in response to
new information obtained.

See Exhibit "7".

419.   This concept also is emphasized in the CPT Assistant, which states that "Pre-set
protocols automatically testing a large number of nerves are not appropriate."

420.   Even so, the Medical PC Defendants did not tailor the NCVs they purported to
perform and/or provide to the unique circumstances of each individual Insured.

421.   Instead, the Medical PC Defendants applied a fraudulent protocol and routinely
purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers for
the Insureds identified in Exhibit "1" and Exhibit "2".

422.   In particular, the Medical PC Defendants routinely purported to test some
combination of the following peripheral nerves and nerve fibers (and in most cases, all of them)
in the NCV tests identified in Exhibit "1" and Exhibit "2":

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibialis or post-tibialis motor nerves;

(iv)     left and right ulnar motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right superficial peroneal sensory nerves;

(viii)   left and right sural sensory nerves; and

(ix)     left and right ulnar sensory nerves.

423.   The Medical PC Defendants' predetermined, boiler-plate approach to the NCVs
that the Medical PC Defendants purported to provide to Insureds clearly was not based on

medical necessity. Instead, the Medical PC Defendants purported to perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers in order to maximize the Defendants' ill-gotten profits.

424.    In keeping with the fact that the purported NCVs tests were medically useless, the putative "results" of the NCV tests allegedly administered by the Medical PC Defendants were never incorporated into any Insured's treatment plan, played no genuine role in the treatment or care of the Insureds and were only used by the PC Defendants to justify billing for further unnecessary medical treatment.

### iii.    The Fraudulent EMGs

425.    The Medical PC Defendants also purported to perform medically unnecessary EMGs on Insureds.

426.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, or muscles.

427.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the

number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

428.    Though, in many cases, EMG tests were purportedly provided on Insureds in order to determine whether the Insureds suffered from radiculopathies, no adequate neurological history and examination is performed to create a foundation for the EDX testing. In actuality, the EMG tests are performed on Insureds as part of the Defendants' predetermined, fraudulent testing and treatment protocol designed to maximize the billing that they submit for each Insured.

429.    The performance of the EMGs was not tailored to the unique circumstances of each patient. Instead, the Medical PC Defendants routinely purported to test many of the same muscles in the same limbs, without regard for individual patient presentation.

430.    Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that are generally performed grossly exceed the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy. Typically, the Medical PC Defendants purported to conduct EMGs on all four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they can submit or cause to be submitted to GEICO and other insurers.

431.    More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed physicians in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT code 95860 if an EMG is performed on at least five muscles of one limb; (ii) $241.50 under CPT code 95861 if an EMG is performed on at least five muscles in each of two limbs; (iii) $314.34 under CPT code 95863 if an EMG is

performed on at least five muscles in each of three limbs; and (iv) $408.64 under CPT code 95864 if an EMG is performed on at least five muscles in each of four limbs.

432.     The Medical PC Defendants routinely purported to perform EMGs on muscles in all four limbs for Insureds solely to maximize the profits that they can reap from each such Insured.

433.     Not only did the Medical PC Defendants purport to provide four-limb EMGs to Insureds, the Medical PC Defendants routinely unbundled the four-limb EMGs into two separate two-limb EMG charges of $241.50 per Insured.

434.     Thus, instead of charging $408.64 per Insured for a single, medically useless four-limb EMG, the Medical PC Defendants routinely submitted total charges of $483.00 for two medically useless two-limb EMGs, resulting in an overcharge of almost $75.00 for each Insured who purportedly received the medically useless EMGs.

435.     The Medical PC Defendants utilized this fraudulent treatment and billing protocol to increase by an order of magnitude the charges for EDX testing that they submitted, or caused to be submitted, to GEICO and other insurers. Through their fraudulent billing practices, Queens Medical routinely submitted billing in excess of $3,212.00 and Northern Medical routinely submitted billing in excess of $3,300.00 for Insureds who purportedly received: (i) a neurological examination; (ii) a four-limb EMG; (iii) NCVs of eight motor nerves with F-wave studies; (iv) NCVs of ten sensory nerves; and (v) two H-reflex studies, all of which were medically unnecessary and were purportedly performed – to the extent they were performed at all – merely to maximize the fraudulent charges that the PC Defendants submitted to GEICO and other insurers. No legitimate physician exercising independent medical judgment would permit the fraudulent treatment and billing protocol described above to proceed under his or her

auspices. The Medical PC Defendants routinely purported to perform medically unnecessary EMGs – to the extent they were performed at all – so as to maximize the fraudulent charges that they submitted to GEICO and other insurers.

### iv.   The Concealment of Excessive and Unnecessary EDX Testing

436.   Not only did the Medical PC Defendants routinely bill for an excessive and medically unnecessary number of EDX tests, but the Medical PC Defendants frequently acted to conceal the excessive number of EDX tests that they purported to provide.

437.   EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

438.   Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed, collectively, on a single date.

439.   Even so, in order to conceal the fact that they routinely billed for a grossly-excessive number of EMG and NCV tests for virtually every Insured, the Medical PC Defendants routinely required the Insureds in the claims identified in Exhibits "1" and "2" to return to Northern Medical and Queens Medical for EDX tests on two separate dates of service, and then split their charges for the EDX tests onto two separate bills.

440.   For example:

(i)     Dr. Ahmed and Northern Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named CT over the course of two separate dates of service – February 4, 2015 and March 4, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii)    Dr. Ahmed and Northern Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named MR over the course of two separate dates of service – March 18, 2015 and

April 8, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii) Dr. Ahmed and Northern Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named PC over the course of two separate dates of service – August 5, 2015 and August 26, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv) Dr. Ahmed and Northern Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named FM over the course of two separate dates of service – December 28, 2015 and February 22, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(v) Dr. Ahmed and Northern Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named JP over the course of two separate dates of service – April 18, 2016 and May 2, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vi) Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named AC over the course of two separate dates of service – July 25, 2017 and August 8, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii) Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named AL over the course of two separate dates of service – August 8, 2017 and August 22, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii) Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named JV over the course of two separate dates of service – October 17, 2017 and November 14, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix) Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named RD over the course of two separate dates of service – October 31, 2017

and November 14, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(x)     Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named ER over the course of two separate dates of service – November 14, 2017 and November 28, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xi)    Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named IG over the course of two separate dates of service – December 4, 2017 and December 18, 2017 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xii)   Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named DF over the course of two separate dates of service – January 15, 2018 and February 12, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiii)  Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named RM over the course of two separate dates of service – April 3, 2018 and May 1, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiv)   Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named VB over the course of two separate dates of service – April 9, 2018 and May 7, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xv)    Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named JA over the course of two separate dates of service – April 17, 2018 and May 7, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xvi)   Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named MS over the course of two separate dates of service – April 23, 2018 and

May 15, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xvii)   Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named YD over the course of two separate dates of service – August 7, 2018 and August 13, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xviii)  Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named EL over the course of two separate dates of service – October 8, 2018 and November 5, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xix)    Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named ER over the course of two separate dates of service – October 2, 2018 and October 16, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xx)     Dr. Boppana and Queens Medical purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named EB over the course of two separate dates of service – November 13, 2018 and December 11, 2018 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

441.   These are only representative examples. In the claims for EDX tests identified in Exhibits "1" and "2", the Medical PC Defendants routinely and unnecessarily purported to subject the Insureds to EDX tests on separate dates of service, and split the EDX test charges onto separate bills, to conceal the fact that they were purporting to provide an excessive and unnecessary number of EDX tests to the Insureds.

**7.      The Fraudulent Physical Therapy Services at Northern Medical and Queens Medical**

442.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured from September 2014 through August 2017, Dr. Ahmed and Northern Medical routinely purported to subject virtually every Insured in Exhibit "1" to a course of medically unnecessary physical therapy services.

443.    Beginning in June 2017, as Dr. Ahmed and Northern Medical ceased providing physical therapy services to new patients at the Northern Boulevard Clinic, Dr. Boppana and Queens Medical continued the fraudulent treatment protocol by purporting to subject the vast majority of the Insureds in Exhibit "2" to medically unnecessary physical therapy services.

444.    In keeping with the fact that the Subleasing PC Defendants did not have legitimate lease agreements with Mayzenberg and Boruch Laosan, despite Dr. Boppana and Queens Medical purportedly beginning to provide physical therapy services at the Northern Boulevard Clinic, Dr. Ahmed and Northern Medical continued to provide physical therapy services to any patient that they had previously treated at the Northern Boulevard Clinic, while Dr. Boppana and Queens Medical also purportedly provided physical therapy services at the Northern Boulevard Clinic.

445.    Like the other Fraudulent Services, despite the fact that the billing for the physical therapy transitioned from Northern Medical to billing the physical therapy under Queens Medical, the fraudulent treatment protocols surrounding the rendering and billing of the physical therapy remained intact.

446.    Like the charges for the other Fraudulent Services, the charges submitted by the Medical PC Defendants for the physical therapy were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent

treatment and billing protocols designed solely to maximize profits and pursuant to the improper referral and financial arrangements.

447.    The Medical PC Defendants routinely purported to subject the Insureds to multiple, voluminous physical therapy treatments generally resulting in hundreds of dollars – and in some instances thousands of dollars – of charges for the vast majority of the Insureds purportedly treated at the Northern Boulevard Clinic.

448.    Specifically, as a result of the predetermined diagnoses alleged in the initial examinations performed by the Medical PC Defendants, the vast majority of Insureds were referred for a course of physical therapy that involved a substantially similar treatment plan, with many instances of the treatment being rendered typically two to three times per week for months.

449.    Through this boilerplate treatment and billing protocol, the Medical PC Defendants purported to provide the vast majority of the Insureds with an initial physical therapy evaluation billed under CPT code 97001 and resulting in a charge of $80.02.

450.    In keeping with the fact that the Medical PC Defendants treated Insureds at the Northern Boulevard Clinic pursuant to fraudulent treatment and billing protocols, the Medical PC Defendants' physical therapy evaluations were boilerplate, cursory, and repetitive, and indicated that the Insureds presented with nearly identical problems that resulted in the same treatment plans.

451.    For example, Northern Medical and Queens Medical used a virtually identical single-sheet template evaluation form in performing their initial physical therapy evaluations. Essentially every Insured evaluated by the Medical PC Defendants was provided with a "Treatment Plan" that consisted of:

- HP/CP
- ES/Tens

- Massage/MTT/MFR
- Therapeutic Exercises
- Therapeutic Activities
- Functional Capacity
- ADL re-training/HEP

452.    In addition to the virtually identical initial physical therapy evaluations, the Medical PC Defendants submitted substantially the same combination of charges for every date on which virtually every Insured purportedly received physical therapy services: (i) hot/cold pack, using CPT code 97010; (ii) electrical stimulation, using CPT code 97014; and (iii) therapeutic exercises, using CPT code 97124.

453.    In keeping with the fact that Dr. Boppana and Queens Medical continued to treat patients according to the same fraudulent treatment protocols as Dr. Ahmed and Northern Medical, from July 2017 through October 2017, the same physical therapist purportedly treated both Northern Medical's and Queens Medical's patients at the Northern Boulevard Clinic on over 50 dates of service.

454.    The Medical PC Defendants charges for the physical therapy were predicated on the phony boilerplate "diagnoses" provided to the Insureds following the initial and follow-up examinations, as well as the medically useless and fraudulent neurological examinations and EDX tests that the Medical PC Defendants purported to perform at the Northern Boulevard Clinic pursuant to the Defendants' fraudulent predetermined treatment and billing protocols.

455.    But for these ersatz "diagnoses," the Medical PC Defendants would not have been able to submit charges for the physical therapy in the first instance, because they would have had no way to justify the performance of months of physical therapy services to the vast majority of Insureds.

456. The Medical PC Defendants purported to provide this substantially similar physical therapy treatment plan to the vast majority of Insureds, regardless of the Insureds' individual circumstances or unique presentation, to submit as much billing as possible for physical therapy services, without regard for medical necessity.

### 8. The Fraudulent Chiropractic Services by Restoralign Chiro

457. In addition to the other Fraudulent Services, virtually all of the Insureds at the Northern Boulevard Clinic were subjected to a course of medically unnecessary chiropractic services through Krasner and Restoralign.

458. As with the charges for the other Fraudulent Services, the charges for the chiropractic services purportedly performed by Krasner and Restoralign Chiro on the Insureds in Exhibit "3" were fraudulent in that they were (i) medically unnecessary and performed pursuant to predetermined treatment protocols; (ii) performed pursuant to the exaggerated diagnoses set forth in the fraudulent initial chiropractic examinations and as part and parcel of the Defendants' fraudulent treatment and billing protocols; and (iii) provided pursuant to the improper referral and financial arrangements.

### a. The Fraudulent Chiropractic Examinations

459. In addition to the fraudulent initial medical examinations, pursuant to the Defendants' fraudulent predetermined treatment and billing protocols, the Medical PC Defendants referred virtually every patient to Krasner and Restoralign Chiro for chiropractic services, including the fraudulent initial chiropractic examinations that Krasner and Restoralign Chiro rendered to virtually every Insured.

460. Insureds at the Northern Boulevard Clinic were also subjected to an initial chiropractic examination which served as "justification" to provide medically unnecessary,

illusory, or otherwise un-reimbursable chiropractic treatment. Pursuant to the Defendants' fraudulent treatment and billing protocols, Krasner and Restoralign Chiro always billed the initial chiropractic examinations to GEICO under CPT code 99203 resulting in a charge of $54.74.

461.    The charges for the initial chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the amount of time spent on the examinations; (iii) misrepresented the extent of the examinations allegedly performed; and (iv) misrepresented the extent of the medical decision-making during the examinations.

462.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

463.    By contrast, to extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft tissue injuries such as sprains and strains.  However, Krasner and Restoralign Chiro, in their claims for initial chiropractic examinations, routinely billed for the putative examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

464.    Krasner and Restoralign Chiro also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203 because examinations billable under CPT code 99203

are reimbursable at higher rates than examinations involving presenting problems of low severity.

465.    Krasner and Restoralign Chiro also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry-list of other Fraudulent Services that the PC Defendants purported to provide to the Insureds, including chiropractic services.

466.    Additionally, pursuant to the Fee Schedule, the use of CPT code 99203 represents that the chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the Insured or the Insured's family.

467.    Krasner and Restoralign Chiro submitted all of their billing for initial chiropractic examinations under CPT code 99203, and as such represented that the chiropractors who performed the initial examinations spent at least 30 minutes of face-to-face time with the Insureds or their families during the putative examinations.

468.    In fact, none of the chiropractors associated with Restoralign Chiro actually spent 30 minutes performing the initial chiropractic examinations. To the extent that these examinations were performed in the first instance, they did not entail 30 minutes of face-to-face time between the examining chiropractors and the Insureds or their families.

469.    Rather, the initial chiropractic examinations were comprised of a simple boilerplate, template, checklist form which was used to conduct the examinations, and which set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

470.     The only face-to-face time between the examining chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

471.     These brief interviews and limited examinations did not require any chiropractor associated with Krasner and Restoralign Chiro to spend 30 minutes of face-to-face time with the Insureds or their families.

472.     Krasner and Restoralign Chiro falsely represented that the initial chiropractic examinations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

473.     When Krasner and Restoralign Chiro billed for the initial chiropractic examinations under CPT code 99203, they also falsely represented that the examining chiropractors performed "detailed" examinations on the Insureds they purported to treat during the examinations.

474.     In fact, with respect to the claims for initial chiropractic examinations under CPT code 99203, no chiropractor associated with Krasner and Restoralign Chiro ever conducted an extended examination of the Insureds' musculoskeletal systems.

475.     What is more, Krasner and Restoralign Chiro did not consider any significant number of diagnoses or treatment options for Insureds during the initial chiropractic examinations. Rather, to the extent that the examinations were conducted in the first instance, Krasner and Restoralign Chiro provided a laundry-list of exaggerated "diagnoses" for every Insured, and prescribed a virtually identical course of treatment for every Insured. To the extent

that the Insureds ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems were virtually always limited to ordinary sprains or strains of the neck and back.

476.    The diagnoses and treatment plans bore no actual relationship to the conditions actually presented, but were simply recited as a matter of course in order to justify the performance of the chiropractic services and other Fraudulent Services.

477.    In fact, every Insured that treated with Restoralign Chiro was placed on the same treatment plan which consisted of chiropractic manipulation three to four times per week for months on end, and would "consist of gentle chiropractic manipulation (or adjustments) to the cervical/thoracic/lumbar spine."

478.    Additionally, the treatment plan for every Insured stated that the Insured would be referred for cervical, thoracic, and lumbar x-rays; these referrals were "supported" by boilerplate, pre-printed language that appears on every initial examination report submitted by Krasner and Restoralign Chiro in support of their charges, including that the x-rays would "rule out unstable vertebral motor units and derangement."

479.    Similarly, the treatment plan for every Insured stated that the Insured would be referred for cervical and lumbar MRIs; these referrals were "supported" by boilerplate, pre-printed language that appears on every initial examination report submitted by Krasner and Restoralign Chiro in support of their charges, including that the MRIs would "rule out HNP, disc bulge, spinal stenosis or foraminal stenosis."

480.    The claims for initial chiropractic examinations are fraudulent in that Krasner and Restoralign Chiro routinely falsely represented the extent of the examinations as well as the

diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the PC Defendants for the Fraudulent Services.

481. In addition to the fraudulent initial chiropractic examinations, Krasner and Restoralign Chiro purported to provide at least one follow-up examination to many Insureds at the Northern Boulevard Clinic.

482. Like the initial chiropractic examinations, the purpose of the follow-up examinations was to further inflate the billing the PC Defendants could submit to GEICO and to further justify the continued rendering of medically unnecessary, illusory, or otherwise un-reimbursable chiropractic treatment.

483. Krasner and Restoralign Chiro always billed the follow-up chiropractic examinations to GEICO under CPT code 99212 resulting in a charge of $26.41.

484. The charges for the follow-up chiropractic examinations were fraudulent in that they: (i) misrepresented the extent of the Insureds' presenting problems; (ii) misrepresented the extent of the examinations allegedly performed; and (iii) misrepresented the extent of the medical decision-making during the examinations.

485. Similar to the initial chiropractic examinations, the follow-up chiropractic examinations were comprised of simple boilerplate, template, checklist form and which set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

486. Like the claims for the initial chiropractic examinations, the claims for follow-up chiropractic examinations are fraudulent in that Krasner and Restoralign Chiro routinely falsely represented the extent of the examinations as well as the diagnoses and conditions of the Insureds for the sole purpose of justifying additional billing submitted by the PC Defendants for

the Fraudulent Services.

### b. The Fraudulent Chiropractic Treatment

487.    Following the fraudulent chiropractic examinations, Krasner and Restoralign Chiro purported to provide Insureds with months of chiropractic manipulation therapy that virtually always billed under CPT code 98940 and 98941.

488.    Like the other charges for Fraudulent Services, the charges for the chiropractic manipulation treatments were fraudulent in that the services were medically unnecessary and were performed pursuant to the Defendants' fraudulent predetermined treatment and billing protocols.

489.    Insureds were subjected to multiple sessions of chiropractic manipulation therapy per week over a period of many months, generally resulting in hundreds of dollars of charges for each Insured.  The purported results of the other Fraudulent Services (i.e. medical examinations, chiropractic examinations and OAT) were used by the PC Defendants as justification for continued rounds of chiropractic manipulation therapy despite the fact Krasner and Restoralign Chiro never incorporated the so-called "findings" of the other PC Defendants or the results of the other Fraudulent Services into the chiropractic manipulation therapy.

490.    In keeping with the fact that Krasner and Restoralign Chiro submitted bills to GEICO as part of a fraudulent scheme to generate profits, in addition to purportedly providing Insureds with chiropractic manipulation for months, with these chiropractic manipulations being rendered multiple times per week for the majority of each Insured's chiropractic treatment, Krasner and Restoralign Chiro also purported to render additional services to virtually every Insured billed under CPT code 97139 for "Stretching", resulting in a charge of $11.56 or $15.14 for every date of service. The Fee Schedule defines CPT code 97139 as "[u]nlisted therapeutic

procedure (specify)." Despite the fact that Krasner and Restoralign Chiro billed for services rendered under this code for virtually every Insured on every date of service, nowhere in the initial examination reports do Krasner and Restoralign Chiro indicate the Insureds are to receive any chiropractic modalities other than manipulations.

491. The months of continued unchanging fraudulent chiropractic treatments that were performed on virtually every Insured were not based on medical necessity and not intended to resolve the complaints/symptoms of the Insureds. Instead, the "protocol" approach to the performance of the fraudulent chiropractic treatments was designed solely to maximize the charges that the Defendants could submit to GEICO, and other automobile insurers, and to maximize the revenues that could be generated from each Insured who was subjected to the protocol.

### 9. The Fraudulent Acupuncture Services by Wei Dao Acu

492. In addition to the other Fraudulent Services, the vast majority of the Insureds at the Northern Boulevard Clinic were subjected to a course of medically unnecessary acupuncture services through Mayzenberg and Wei Dao Acu.

493. As with the charges for the other Fraudulent Services, the charges for the acupuncture services purportedly performed by Mayzenberg and Wei Dao Acu on the Insureds in Exhibit "4" were fraudulent in that they were (i) medically unnecessary and performed pursuant to a predetermined treatment protocol; and (ii) provided pursuant to the improper referral and financial arrangements amongst the Defendants. The acupuncture services were also purportedly provided pursuant to the exaggerated diagnoses set forth in the fraudulent initial acupuncture examinations.

494.    Consistent with the excessive and fraudulent provision of the healthcare services purportedly provided to the Insureds at the Northern Boulevard Clinic, Mayzenberg and Wei Dao Acu purported to subject the vast majority of Insureds to a series of medically unnecessary acupuncture treatments.

495.    In furtherance of the Defendants' fraudulent scheme, every Insured who was referred to Mayzenberg and Wei Dao Acu was subjected to acupuncture treatments that were provided – to the extent that they were provided at all – pursuant to a predetermined, fraudulent protocol, inconsistent with the exercise of professional judgment by an acupuncturist genuinely concerned with patient care.

496.    Mayzenberg and Wei Dao Acu's predetermined, fraudulent protocol was predicated on fabricated exams and reports used to support excessive and medically unnecessary acupuncture treatments not warranted by the patients' conditions in order to inflate the billing and maximize the profits that could be gained from the billing submitted under Wei Dao Acu.

497.    At best, the purported "acupuncture" services provided by Mayzenberg and Wei Dao Acu consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and instead reflected a predetermined protocol designed to enrich Mayzenberg and Wei Dao Acu through the submission of fraudulent charges to GEICO and other insurers.

### a.   Legitimate Acupuncture Practices

498.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows.  Every individual has a unique energy flow ("Chi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's

unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

499.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

500.    Since every individual has a unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

501.    The first step in any legitimate acupuncture treatment is a physical examination of the patient. The two most critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these elements of the physical examination is necessary to diagnose the patient's condition and thereby develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi.  In cases involving trauma – such as an automobile accident - an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

502.    The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be

inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

503.    In developing a legitimate acupuncture treatment plan, an acupuncturist may choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

504.    The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan.  If performed legitimately, this step in the treatment typically will involve insertion of between 10 and 20 acupuncture needles into between five and 10 Acupuncture Points for a minimum of 20 minutes. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

505.    Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

506.    Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's  progress throughout the course of treatment.

### b.  Wei Dao Acu's Fraudulent Acupuncture Treatment

507.    In contrast to legitimate acupuncture practices, Mayzenberg and Wei Dao Acu treated each patient without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.

508.    The documents Mayzenberg and Wei Dao Acu submitted to GEICO in support of their charges for the purported acupuncture services demonstrate that no genuine effort was made to treat the Insureds' actual injuries, to properly assess their condition, to monitor their improvement or lack thereof, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

509.    At best, the purported "acupuncture" services provided by Mayzenberg and Wei Dao Acu consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and instead reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

### i.    Wei Dao Acu's Fraudulent Acupuncture Examinations

510.    Insureds at the Northern Boulevard Clinic were also subjected to an initial acupuncture examination which served as "justification" to provide medically unnecessary, illusory, or otherwise un-reimbursable acupuncture treatment. Pursuant to the Defendants' fraudulent treatment and billing protocol, Mayzenberg and Wei Dao Acu always billed the initial acupuncture examinations to GEICO under CPT code 99203 resulting in a charge of $54.74.

511.    Like the charges for the other Fraudulent Services, the charges for the initial acupuncture examinations were fraudulent in that they were performed – to the extent they were

performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits and pursuant to the improper referral and financial arrangements between the Defendants.

512. As established above, the first step in any legitimate acupuncture treatment is a physical examination of the patient. However, Mayzenberg and Wei Dao Acu virtually never conducted any legitimate examinations or evaluations of the Insureds referred to them by their Referral Sources.

513. For instance, Wei Dao Acu's patients have been universally provided with (or purportedly provided with) very high frequency of treatments not supported by the alleged injuries and not adjusted to reflect the Insureds' improvement or lack thereof.

514. As a result of Mayzenberg and Wei Dao Acu's failure to conduct or document legitimate physical examinations of the Insureds, Mayzenberg and Wei Dao Acu did not develop discrete treatment plans designed to treat the individual Insureds.

515. Instead, in nearly every case, the initial recommendation from Wei Dao Acu was for the patient to treat several times per week, regardless of severity of the accident, regardless of the patient's age, and regardless of the type of injury. These unvarying recommendations formed the basis for a systematized treatment and billing scheme designed to create inflated billings and render medically unnecessary care.

516. Furthermore, the documentation of the purported acupuncture treatments rendered under Wei Dao Acu demonstrates that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to track their improvement or lack of improvement, or to adjust the treatment to reflect the patients' improvement or lack of improvement. The documentation of the treatment further demonstrates that, to a significant extent, it is fabricated

and used as nothing more than a sham to support a predetermined and fraudulent treatment protocol.

517.    Specifically, Wei Dao Acu's initial evaluations, in addition to being extremely superficial and lacking in substantive information, are fabricated because, among other things:

- Virtually every patient is diagnosed with lumbosacral spine injuries with loss of lumbar lordosis.

- Virtually every patient is diagnosed with reduced/limited range of motion.

- Virtually every patient is reported to have monotonicity.

- Virtually every patient is diagnosed with a strain/ sprain in the area of pain.

- Virtually every patient diagnosed with a neck injury is also noted as having problems with having tenderness to the base of the neck and over both trapezii muscles.

- Virtually all patients with knee pain are reported to have pain and tenderness over both the medial femoro-tibial joint spases.

518.    To that end, virtually every patient purportedly examined by Wei Dao Acu received the exact same boilerplate treatment plan on the exact same boilerplate treatment notes – regardless of the severity of the harm, presentment, or the nature of the injury sustained.  The exams themselves are superficial and devoid of valid clinical findings and lacking in many key elements needed to accurately diagnose the patient's condition.

519.    In the initial narrative reports, for instance, the "Treatment" section for virtually every patient purportedly examined by Wei Dao Acu reads "[n]eedles were retained in the body for 10-15 minutes every time with re-insertion of needles (another 10-15 minutes) for each pathological conditions, depending of (sic) severity" and the patient is recommended treatment of "two – three times a week."

520.    Furthermore, the charges for the initial examinations were fraudulent in that they

misrepresented the extent of the initial acupuncture examinations.

521.    For example, in every claim identified in Exhibit "4"for initial acupuncture examinations under CPT code 99203, Mayzenberg and Wei Dao Acu misrepresented and exaggerated the amount of face-to-face time that the examining acupuncturist spent with the Insureds or the Insureds' families.

522.    The use of CPT code 99203 typically requires that an acupuncturist spend 30 minutes of face-to-face time with the Insured or the Insured's family.

523.    Though Mayzenberg and Wei Dao Acu billed for their initial acupuncture examinations under CPT code 99203, no acupuncturist or other healthcare professional associated with Wei Dao Acu spent 20 minutes, let alone 30 minutes, on an initial acupuncture examination.

524.    Rather, the initial acupuncture examinations in the claims identified in Exhibit"4" rarely lasted more than 10 – 15 minutes.

525.    In keeping with the fact that the initial acupuncture examinations rarely lasted more than 10 – 15 minutes, Mayzenberg and Wei Dao Acu used checklist forms in purporting to conduct the initial acupuncture examinations.

526.    The checklist forms Mayzenberg and Wei Dao Acu used in conducting the initial acupuncture examinations set forth a limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

527.    All that was required to complete the checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds.

528.    These interviews and examinations did not require Mayzenberg and Wei Dao Acu to spend more than 10 – 15 minutes of face-to-face time with the Insureds during the putative initial acupuncture examinations.

529.    In addition, pursuant to the Fee Schedule, when Mayzenberg and Wei Dao Acu submitted charges for initial acupuncture examinations under CPT code 99203, or caused them to be submitted, they falsely represented that an acupuncturist associated with Wei Dao Acu: (i) took a "detailed" patient history and (ii) conducted a "detailed" physical examination.

530.    Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician or acupuncturist take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

531.    However, in the claims for initial acupuncture examinations identified in Exhibit "4", Mayzenberg and Wei Dao Acu never took a "detailed" patient history from Insureds during the initial acupuncture examinations, inasmuch as they did not take a history of systems related to the patient's presenting problems and did not conduct any review of a limited number of additional systems.

532.    Rather, after purporting to provide the initial acupuncture examinations, Mayzenberg and Wei Dao Acu simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

533.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of: (i) purported diagnoses that did not correlate with the patient's actual symptoms or concerns; and (ii)

Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers.

534.     Moreover, pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

535.     To the extent that the Insureds in the claims identified in Exhibit "4" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

536.     Pursuant to the CPT Assistant, in the context of patient examinations, a physician or acupuncturist has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or acupuncture has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)     examination of gait and station;

(vii)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)     coordination;

     (ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

     (x)    examination of sensation.

537.    In the claims for initial acupuncture examinations in Exhibit "4" in which Mayzenberg and Wei Dao Acu billed for the initial acupuncture examinations under CPT code 99203, Mayzenberg and Wei Dao Acu falsely represented that they conducted a "detailed" patient examination of the Insureds they purported to treat during the initial acupuncture examinations.

538.    In fact, Mayzenberg and Wei Dao Acu never conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

        **ii.**    **The Fraudulent Acupuncture Reexaminations Through Wei Dao Acu**

539.    In addition to the fraudulent initial acupuncture examinations, Mayzenberg and Wei Dao Acu typically to subject virtually every Insured in Exhibit "4" to one or more fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment protocol, and always billed the follow-up examination under CPT code 99202 resulting in a charge of $42.02.

540.    Like the charges for the other Fraudulent Services, the charges for the follow-up acupuncture examinations were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocol designed solely to maximize profits and pursuant to the improper referral and financial arrangements between the Defendants.

541.   Furthermore, Wei Dao Acu's charges for the follow-up acupuncture examinations were fraudulent in that they misrepresented the extent of the examinations.

542.   The use of CPT code 99202 typically requires that the physician or acupuncturist spend 20 minutes of face-to-face time with the Insured or the Insured's family, along with taking an expanded problem-focused history and an expanded problem focused examination.

543.   In keeping with the fact that Mayzenberg and Wei Dao Acu misrepresented the extent of the examinations, Mayzenberg and Wei Dao Acu used template forms in conducting the examinations which consisted primarily of boilerplate language and one pre-printed checklist for the Insureds' complaints.

544.   In fact, Mayzenberg and Wei Dao Acu's template form for the follow-up acupuncture examination was virtually all boilerplate language, including boilerplate language for the Insureds' "Treatment Goal", "Treatment Plan", and "Prognosis".

545.   In keeping with the fact that Mayzenberg and Wei Dao Acu's follow-up acupuncture examination played no genuine role in the Insureds' treatment, virtually all of the follow-up examination forms are barely legible.

546.   The pre-printed checklist and template forms that Mayzenberg and Wei Dao Acu used do not reflect any genuine examination of the Insureds and contain purported findings that are, at best, a reiteration of the Insureds' alleged subjective complaints.

547.   Finally, in keeping with the fact that the acupuncture examinations were performed – to the extent they were performed at all – pursuant to a fraudulent, predetermined billing and treatment protocol, the pre-printed checklist and template forms contain a boilerplate prognosis of "the patient's prognosis is guarded for a complete recovery".  No other option is possible.

548.     Additionally, in keeping with the fact that Mayzenberg and Wei Dao Acu purportedly performed follow-up examinations to maximize profits, Mayzenberg and Wei Dao Acu improperly billed for the follow-up examinations under CPT code 99202.  According to the CPT Assistant, CPT code should only be billed as an examination of a new patient.  Mayzenberg and Wei Dao Acu improperly billed for the follow-up acupuncture examinations under CPT code 99202 rather than CPT code 99212 to maximize their ill-gotten profits.

### iii.     The Fraudulent Acupuncture Treatment Through Wei Dao Acu

549.     Mayzenberg and Wei Dao Acu's fraudulent treatment protocol is further established by Wei Dao Acu routinely billing three units of acupuncture per treatment date per patient.

550.     Mayzenberg and Wei Dao further fraudulently inflated their billing by charging for an "adjunct" acupuncture procedure known as cupping.

551.     Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area.  Once stagnant blood has been moved, additional cupping is unnecessary – yet Mayzenberg and Wei Dao Acu billed for cupping as a matter of course, without any evidence of need or effectiveness.

552.     Mayzenberg and Wei Dao Acu frequently submitted charges under CPT code 97039 for medically unnecessary cupping services – oftentimes purporting to have provided cupping services to the same Insured multiple times in a single week – in order to fraudulently inflate their billing.

553.     Additionally, Mayzenberg and Wei Dao further inflated their billing by charging for a procedure known as moxibustion, another "adjunct" procedure, billed to GEICO using CPT code 97799, a code reserved for "unlisted" procedures.

554.    In a legitimate clinical setting, moxibustion involves the application and burning of liquid herbs on the skin of the patient. However, Mayzenberg and Wei Dao Acu never performed legitimate moxibustion services, but instead merely involved Mayzenberg and Wei Dao Acu heating of a liquid on Insureds' skin. Merely heating liquid herbs on a patient's skin does not have the same therapeutic effect of actual burning.

555.    Mayzenberg and Wei Dao Acu fraudulently represented that they had performed legitimate moxibustion services to create the opportunity to submit a high volume of billing to GEICO under CPT code 97799, not to otherwise treat or benefit the Insureds.

556.    Mayzenberg and Wei Dao Acu's cookie-cutter approach to the acupuncture treatments that they performed, or cause to be performed, on the vast majority of Insureds at the Northern Boulevard Clinic was designed solely to maximize the charges that they could submit through Wei Dao Acu to GEICO and other insurers, and to maximize their ill-gotten profits.

557.    Not only did Mayzenberg and Wei Dao Acu submit billing, or cause it to be submitted, for medically unnecessary acupuncture treatments that were provided without regard to patient care, Mayzenberg and Wei Dao Acu also misrepresented the nature and extent of the treatments that actually were provided in the billing that they submitted, or caused to be submitted, to GEICO.   These misrepresentations were plainly part of the predetermined, fraudulent billing protocol imposed by Mayzenberg and Wei Dao Acu in an attempt to maximize their own ill-gotten gains, not to treat or otherwise benefit the Insureds.

1.  **Misrepresentations Regarding Amount of One-On-One Contact with Insureds**

558.    The Fee Schedule sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

| 97810 | Acupuncture, one or more needles, without electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient |
| 97811 | without electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |
| 97813 | with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |
| 97814 | with electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |

559.    Wei Dao Acu's bills indicated that a typical "treatment" for one patient generally consisted of: (i) charges for one unit of acupuncture treatment using CPT code 97810, typically resulting in a charge of $30.00, and at least two additional units of acupuncture treatment using treatment CPT code 97811, typically resulting in charges of $25.69 apiece; (ii) charges for one unit of acupuncture treatment using CPT code 97813, typically resulting in a charge of $35.00, and at least one additional unit of acupuncture treatment using CPT code 97814, typically resulting in charges of $30.00 apiece; or (iii) charges for one unit of acupuncture treatment using CPT code 97811, one unit of acupuncture treatment using CPT code 97813, and one unit of acupuncture using CPT code 97814.

560.    Additionally, Wei Dao Acu's bills indicated that their typical  treatment for one patient also consisted of: (i) one charge for one unit of moxibustion services using code 97799, typically resulting in a charge of $35.00; and (ii) one charge for one unit of cupping services using code 97039, typically resulting in a charge of $35.00.

561.    When Mayzenberg and Wei Dao Acu submitted bills for three units of acupuncture, they represented that there was an initial 15 minutes of "personal one-on-one contact with the patient;" then there was an additional 15 minutes of "personal one-on-one

contact with the patient" with re-insertion of needles; and then there was yet a third segment of personal one-on one contact with that same patient with re-insertion of needles.

562.     Wei Dao Acu's billing was plainly inflated.  In reality, Mayzenberg and Wei Dao Acu rarely –if ever – spent 15 minutes of personal, one-on-one contact with each patient, let alone the amount of time represented by the use of three billing codes for one treatment session with a patient.

563.     Indeed, based on the number of treatment segments that Wei Dao Acu has billed GEICO for, it is highly unlikely for Wei Dao Acu's treating acupuncturists to have provided the personal, one-on-one care to each patient as required by the CPT codes.

564.     In keeping with the fact that Mayzenberg and Wei Dao Acu never truly spent the amount of time required under the codes for personal, one-on-one contact with each patient, Wei Dao Acu often times submitted between 50 and 70 discrete, 15-minute acupuncture charges in a single day, representing they had spent between 12 and 17 hours of one-on-one contact with their patients in one day, without factoring in the time spent on initial acupuncture examinations and other treatment. Notably, this virtually-impossible volume of services represents only those bills submitted to GEICO, and does not take into account additional billing submitted by Wei Dao Acu to other insurers.

565.     To the extent treatment was actually performed, Mayzenberg and Wei Dao Acu typically provided 15 minutes-worth of purported acupuncture services, virtually none of which was spent face-to-face with their patients. Instead, Mayzenberg and Wei Dao Acu merely placed needles in Insureds' necks and backs, set a timer, and left the Insureds unattended until 15 minutes had elapsed.

566. The purported acupuncture treatment described in the treating acupuncturist's notes for Wei Dao Acu in almost all cases failed to justify the billing submitted for multiple units of personal, one-on-one contact, with re-insertion of needles.

567. Mayzenberg and Wei Dao Acu's fraudulent billing scheme misrepresented, inflated and exaggerated the level of services provided in order to inflate the charges submitted to GEICO.

## 2. The Fraudulent Re-Insertion Charges

568. In a legitimate clinical setting, an acupuncturist will place between 10 and 20 needles in the patient's back and neck for a single 15 to 20 minute session. However, in an attempt to maximize the fraudulent billing they could submit to insurers, including GEICO, Mayzenberg and Wei Dao Acu falsely represented that their treatment required the removal and reinsertion of smaller numbers of needles.

569. For instance, in many of the claims identified in Exhibit "4" Mayzenberg Wei Dao Acu submitted two discrete charges under CPT code 97811 – representing that they had removed and re-inserted the needles twice after an initial round of acupuncture billed under CPT code 97810 – all as part of a single session with Insureds. In almost all cases, to the extent treatment was actually provided, Mayzenberg and Wei Dao Acu inserted a small number of needles at a time into the Insureds' necks, backs, and shoulders.

570. In reality, however, Mayzenberg and Wei Dao Acu fraudulently manufactured these charges. Instead of inserting higher numbers of needles into the necks, shoulder, of backs of Insureds simultaneously – and submitting just a single charge under CPT code 97810 – Mayzenberg and Wei Dao Acu purported to insert a small number of needles at a time into most of the Insureds. Then, Mayzenberg and Wei Dao Acu purported to remove and reinsert needles

into entirely different areas on the Insureds, thereby creating a contrived opportunity to submit two additional charges under CPT code 97811.

571.    In almost every case, all of the needles purportedly inserted into the Insureds in a given session by Mayzenberg and Wei Dao Acu could have been inserted at the same time.

572.    In reality, Wei Dao Acu's treating acupuncturists never spent the full amount of the personal one-on-one contact time with the patients mandated by the CPT codes.  Instead, the treating acupuncturists, as part of the predetermined protocol, spent only a few minutes of personal one-on-one contact with each patient, constantly moving to the next patient as part of plan to maximize profits.

573.    Mayzenberg and Wei Dao Acu, through this fraudulent billing scheme, increased by a huge order of magnitude the charges that they submitted, or caused to be submitted, to GEICO.

## III.    The Fraudulent Billing the PC Defendants Submitted or Caused to be Submitted to GEICO

574.    To support their fraudulent healthcare charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 or similar forms of bills) consistently have been submitted to GEICO by and on behalf of the Subleasing Owner Defendants, Mayzenberg, and the PC Defendants seeking payment for services for which the PC Defendants were ineligible to receive payment.

575.    The bills, NF-3 forms, and treatment reports submitted to GEICO by and on behalf of the PC Defendants were false and misleading in the following material respects:

(i)    The bills, NF-3 forms, and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and properly billed. In fact, the Fraudulent Services were not medically necessary and were billed in an inflated manner – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols

designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The bills, NF-3 forms, and treatment reports uniformly misrepresented to GEICO that the PC Defendants were in compliance with material licensing requirements and entitled to No-Fault reimbursement.  In fact, the PC Defendants were not entitled to No-Fault reimbursement because they had engaged in a scheme to defraud involving unlawful fee-splitting, kickback, and illegal referral arrangements in violation of New York law.

(iii)   The bills, NF-3 forms, and treatment reports uniformly misrepresented to GEICO the level and nature of the services purportedly provided in order to mislead GEICO into paying for such services. To that end, the PC Defendants' bills misrepresented and exaggerated the level of services purportedly provided and unbundled the services to inflate the charges.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

576.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

577.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment, including submitting billing under multiple professional entities and concealing the payments of kickbacks and financial payments for referrals through purportedly legitimate financial arrangements.

578.    Specifically, the Defendants knowingly have misrepresented and concealed facts related to the PC Defendants in an effort to prevent GEICO from discovering that the PC Defendants were engaged in a scheme to defraud using fee splitting, kickbacks, and payments for referrals and, therefore, are ineligible to bill for or collect No-Fault Benefits.

579.    To that end, in every bill that the PC Defendants submitted or caused to be submitted to GEICO, the Defendants uniformly misrepresented that the PC Defendants were

operating in compliance with state licensing laws, and eligible to bill for and collect No-Fault Benefits, when, in fact, they were not.

580.    In addition, the Defendants used bank accounts that were defunct, dissolved, and not associated with their health care practice in order to conceal their fraudulent kickback payments, thereby preventing GEICO from identifying these payments.

581.    Furthermore, the Defendants knowingly misrepresented and concealed facts, including fabricating exams and reports, in order to prevent GEICO from discovering that the Fraudulent Services provided through the PC Defendants were medically unnecessary and were performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that can be submitted.

582.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the PC Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the PC Defendants have been engaged in fraud.

583.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,958,000.00 based upon the fraudulent charges representing payments made by GEICO since January 2015.

584.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have

discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

585.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

586.   There is an actual case in controversy between GEICO and the Defendants regarding more than $3,161,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO through under the names of the PC Defendants.

587.   Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the PC Defendants because the Defendants engaged in an unlawful scheme to defraud New York automobile insurers through illegal fee-splitting, kickback, and payments for referral arrangements in violation of New York law.

588.   Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the bills for the Fraudulent Services were fraudulently inflated and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

589.   Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of the PC Defendants because the billed-for services were performed – to the extent they were performed at all - pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich Defendants in contravention of New York law.

590.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they engaged in a scheme to defraud through unlawful referral, kickback, and fee-splitting arrangements;

(ii)    the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were medically unnecessary and were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, predetermined protocols designed solely to maximize charges to GEICO, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly have been subjected to them; and

(iii)   the PC Defendants have no right to receive payment for any pending bills submitted to GEICO because the CPT codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO

## SECOND CAUSE OF ACTION
### Against Dr. Ahmed
### (Violation of RICO, 18 U.S.C. § 1962(c))

591.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

592.    Northern Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

593.    Dr. Ahmed knowingly conducted and/or participated, directly or indirectly, in the conduct of Northern Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Northern Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich the

Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the billed-for services were performed pursuant to an illegal kickback and referral scheme. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO through Northern Medical that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

594.    Northern Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Ahmed operated Northern Medical, inasmuch as Dr. Ahmed was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Northern Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Dr. Ahmed continues to attempt collection on the fraudulent billing submitted through Northern Medical to the present day.

595.    Northern Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to engage in illegal kickback and referral arrangements. Northern Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Northern Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

596.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,078,000.00 pursuant to the fraudulent bills submitted by Dr. Ahmed through Northern Medical.

597.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Northern Medical and Dr. Ahmed**
**(Common Law Fraud)**

598.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

599.    Northern Medical and Dr. Ahmed intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for healthcare services.

600.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:  (i) the representation that the billed-for services were medically necessary, when in fact they were not medically necessary, and instead were the product of predetermined, fraudulent treatment and billing protocols designed solely to unjustly enrich the Defendants, not to treat or otherwise benefit Insureds; (ii) the representation that Northern Medical was entitled to reimbursement for the billed-for services, when in fact Northern Medical was not entitled to reimbursement, as the billed-for services were the product of scheme involving unlawful fee-splitting, kickback, and illegal referral arrangements; and (iii) the representation that the bills for the Fraudulent Services were proper and accurate, when in fact the bills misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

601.    Northern Medical and Dr. Ahmed intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted that were not compensable under the No-Fault Laws.

602.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,078,000.00 pursuant to the fraudulent bills submitted by Dr. Ahmed through Northern Medical.

603.    Dr. Ahmed and Northern Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

604.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Northern Medical and Dr. Ahmed
### (Unjust Enrichment)

605.    GEICO incorporates, as though fully set forth herein, each and every allegation in set forth above.

606.    As set forth above, Northern Medical and Dr. Ahmed have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

607.    When GEICO paid the bills and charges submitted by or on behalf of Northern Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on Northern Medical's, Dr. Ahmed's, and the other Defendants' improper, unlawful, and/or unjust acts.

608.    Northern Medical and Dr. Ahmed have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Northern Medical and Dr. Ahmed voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

609.    Northern Medical and Dr. Ahmed's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

610.    By reason of the above, Northern Medical and Dr. Ahmed have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,078,000.00.

### FIFTH CAUSE OF ACTION
**Against Dr. Boppana**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

611.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

612.    Queens Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

613.    Dr. Boppana knowingly conducted and/or participated, directly or indirectly, in the conduct of Queens Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Queens Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich the Defendants; (iii) the

billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the billed-for services were performed pursuant to an illegal kickback and referral scheme. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO through Queens Medical that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

614.    Queens Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Boppana operated Queens Medical, inasmuch as Queens Medical was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Queens Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Dr. Boppana continues to attempt collection on the fraudulent billing submitted through Queens Medical to the present day.

615.    Queens Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to engage in illegal kickback and referral arrangements. Queens Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Queens Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

616. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $851,000.00 pursuant to the fraudulent bills submitted by Dr. Boppana through Queens Medical.

617. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Queens Medical and Dr. Boppana
### (Common Law Fraud)

618. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

619. Queens Medical and Dr. Boppana intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for healthcare services.

620. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that the billed-for services were medically necessary, when in fact they were not medically necessary, and instead were the product of predetermined, fraudulent treatment and billing protocols designed solely to unjustly enrich the Defendants, not to treat or otherwise benefit Insureds; (ii) the representation that Queens Medical was entitled to reimbursement for the billed-for services, when in fact Queens Medical was not entitled to reimbursement, as the billed-for services were the product of scheme involving unlawful fee-splitting, kickback, and illegal referral arrangements; and (iii) the representation that the bills for the Fraudulent Services were proper and accurate, when in fact the bills misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

621.    Queens Medical and Dr. Boppana intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted that were not compensable under the No-Fault Laws.

622.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $851,000.00 pursuant to the fraudulent bills submitted by Dr. Boppana and Queens Medical.

623.    Dr. Boppana and Queens Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

624.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Queens Medical and Dr. Boppana**
**(Unjust Enrichment)**

625.    GEICO incorporates, as though fully set forth herein, each and every allegation in set forth above.

626.    As set forth above, Queens Medical and Dr. Boppana have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

627.    When GEICO paid the bills and charges submitted by or on behalf of Queens Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on Queens Medical's, Dr. Boppana's, and the other Defendants' improper, unlawful, and/or unjust acts.

628.    Queens Medical and Dr. Boppana have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Queens Medical and Dr. Boppana voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

629.    Queens Medical and Dr. Boppana's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

630.    By reason of the above, Queens Medical and Dr. Boppana have been unjustly enriched in an amount to be determined at trial, but in no event less than $851,000.00.

## EIGHTH CAUSE OF ACTION
### Against Krasner
### (Violation of RICO, 18 U.S.C. § 1962(c))

631.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

632.    Restoralign Chiro is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

633.    Krasner knowingly conducted and/or participated, directly or indirectly, in the conduct of Restoralign Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Restoralign Chiro was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich the

Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the billed-for services were performed pursuant to an illegal kickback and referral scheme. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO through Restoralign Chiro that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

634.    Restoralign Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Krasner operated Restoralign Chiro, inasmuch as Restoralign Chiro was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Restoralign Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Krasner continues to attempt collection on the fraudulent billing submitted through Restoralign Chiro to the present day.

635.    Restoralign Chiro is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to engage in illegal kickback and referral arrangements. Restoralign Chiro likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Restoralign Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

636.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $456,000.00 pursuant to the fraudulent bills submitted by Krasner through Restoralign Chiro.

637.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Restoralign Chiro and Krasner
### (Common Law Fraud)

638.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

639.    Restoralign Chiro and Krasner intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for healthcare services.

640.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:  (i) the representation that the billed-for services were medically necessary, when in fact they were not medically necessary, and instead were the product of predetermined, fraudulent treatment and billing protocols designed solely to unjustly enrich the Defendants, not to treat or otherwise benefit Insureds; (ii) the representation that Restoralign Chiro was entitled to reimbursement for the billed-for services, when in fact Restoralign Chiro was not entitled to reimbursement, as the billed-for services were the product of scheme involving unlawful fee-splitting, kickback, and illegal referral arrangements; and (iii) the representation that the bills for the Fraudulent Services were proper and accurate, when in fact the bills misrepresented and

exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

641.    Restoralign Chiro and Krasner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted that were not compensable under the No-Fault Laws.

642.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $456,000.00 pursuant to the fraudulent bills submitted by Krasner and Restoralign Chiro.

643.    Krasner and Restoralign Chiro's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

644.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Restoralign Chiro and Krasner**
**(Unjust Enrichment)**

645.    GEICO incorporates, as though fully set forth herein, each and every allegation in set forth above.

646.    As set forth above, Restoralign Chiro and Krasner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

647.    When GEICO paid the bills and charges submitted by or on behalf of Restoralign Chiro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such

payments based on Restoralign Chiro's, Krasner's, and the other Defendants' improper, unlawful, and/or unjust acts.

648.    Restoralign Chiro and Krasner have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Restoralign Chiro and Krasner voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

649.    Krasner and Restoralign Chiro's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

650.    By reason of the above, Restoralign Chiro and Krasner have been unjustly enriched in an amount to be determined at trial, but in no event less than $456,000.00.

## ELEVENTH CAUSE OF ACTION
### Against Mayzenberg
### (Violation of RICO, 18 U.S.C. § 1962(c))

651.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

652.    Wei Dao Acu is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

653.    Mayzenberg knowingly conducted and/or participated, directly or indirectly, in the conduct of Wei Dao Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Wei Dao Acu was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich the Defendants; (iii) the

billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the billed-for services were performed pursuant to an illegal kickback and referral scheme. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO through Wei Dao Acu that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

654.    Wei Dao Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mayzenberg operated Wei Dao Acu, inasmuch as Wei Dao Acu was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Wei Dao Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Mayzenberg continues to attempt collection on the fraudulent billing submitted through Wei Dao Acu to the present day.

655.    Wei Dao Acu is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to engage in illegal kickback and referral arrangements. Wei Dao Acu likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Wei Dao Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

656.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $578,000.00 pursuant to the fraudulent bills submitted by Mayzenberg through Wei Dao Acu.

657.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Mayzenberg and Boruch Laosan
### (Violation of RICO, 18 U.S.C. § 1962(d))

658.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

659.     Wei Dao Acu is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

660.     Mayzenberg and Boruch Laosan are employed by and/or associated with Wei Dao Acu.

661.     Mayzenberg and Boruch Laosan knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Wei Dao Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Wei Dao Acu was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to predetermined, fraudulent treatment and billing protocols designed solely to enrich the Defendants; (iii) the billing codes used for the services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iv) the billed-for services were performed pursuant to an illegal kickback and referral scheme.

662.    Mayzenberg and Boruch Laoson knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

663.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $578,000.00 pursuant to the fraudulent bills submitted through Wei Dao Acu.

664.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**THIRTEEN CAUSE OF ACTION**
**Against Wei Dao Acu and Mayzenberg**
**(Common Law Fraud)**

</div>

665.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

666.    Wei Dao Acu and Mayzenberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent bills seeking payment for healthcare services.

667.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:  (i) the representation that the billed-for services were medically necessary, when in fact they were not medically necessary, and instead were the product of predetermined, fraudulent treatment and billing protocols designed solely to unjustly enrich the Defendants, not

to treat or otherwise benefit Insureds; (ii) the representation that Wei Dao Acu was entitled to reimbursement for the billed-for services, when in fact Wei Dao Acu was not entitled to reimbursement, as the billed-for services were the product of scheme involving unlawful fee-splitting, kickback, and illegal referral arrangements; and (iii) the representation that the bills for the Fraudulent Services were proper and accurate, when in fact the bills misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

668.   Wei Dao Acu and Mayzenberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted that were not compensable under the No-Fault Laws.

669.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $578,000.00 pursuant to the fraudulent bills submitted by Mayzenberg and Wei Dao Acu.

670.   Mayzenberg and Wei Dao Acu's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

671.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Wei Dao Acu and Mayzenberg
### (Unjust Enrichment)

672.   GEICO incorporates, as though fully set forth herein, each and every allegation in set forth above.

673.     As set forth above, Wei Dao Acu and Mayzenberg have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

674.     When GEICO paid the bills and charges submitted by or on behalf of Wei Dao Acu for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Wei Dao Acu's and Mayzenberg's improper, unlawful, and/or unjust acts.

675.     Wei Dao Acu and Mayzenberg have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Wei Dao Acu and Mayzenberg voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

676.     Mayzenberg and Wei Dao Acu's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

677.     By reason of the above, Wei Dao Acu and Mayzenberg have been unjustly enriched in an amount to be determined at trial, but in no event less than $578,000.00

## JURY DEMAND

678.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action Dr. Ahmed, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,078,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Northern Medical and Dr. Ahmed, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,078,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.    On the Fourth Cause of Action against Northern Medical and Dr. Ahmed, more than $1,078,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Dr. Boppana, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $851,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.    On the Sixth Cause of Action against Queens Medical and Dr. Boppana, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $851,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.    On the Seventh Cause of Action against Queens Medical and Dr. Boppana, more than $851,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Krasner, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $456,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Restoralign Chiro and Krasner, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $456,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Restoralign Chiro and Krasner, more than $456,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Mayzenberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $578,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Mayzenberg and Boruch Laoson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $578,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.      On the Thirteen Cause of Action against Wei Dao Acu and Mayzenberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $578,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

N.    On the Fourteen Cause of Action against Wei Dao Acu and Mayzenberg, more than $578,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: March 16, 2020

<div style="margin-left: 40%;">

RIVKIN RADLER LLP

By: _____

Barry I. Levy
Michael A. Sirignano
Steven T. Henesy
Garin Scollan
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*

</div>

4271204

142