UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                              Plaintiffs,                      Docket No.:

          -against-                                 1:20-cv-01214-RRM-LB

NORTHERN MEDICAL CARE, P.C.,
OMAR F. AHMED, M.D.,
QUEENS WELLNESS MEDICAL, P.C.,
MADHU BABU BOPPANA, M.D.,
RESTORALIGN CHIROPRACTIC, P.C.,
DAVID S. KRASNER, D.C.,
WEI DAO ACUPUNCTURE, P.C.,
BORUCH LAOSAN, INC., and
IGOR MAYZENBERG, L.AC.

                              Defendants.
--------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
TO STAY AND ENJOIN UNDERLYING COLLECTION PROCEEDINGS**

                      RIVKIN RADLER LLP
                      Barry I. Levy, Esq.
                      Michael A. Sirignano, Esq.
                      Steven T. Henesy, Esq.
                      Garin Scollan, Esq.
                      926 RXR Plaza
                      Uniondale, New York 11556-0926
                      RR File:  5100-2022
                      Telephone: (516) 357-3000
                      *Counsel for Plaintiffs Government Employees
                      Insurance Company, GEICO Indemnity Company,
                      GEICO General Insurance Company and GEICO
                      Casualty Company*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

OVERVIEW OF NEW YORK'S NO-FAULT LAWS .......................................................... 3

STATEMENT OF RELEVANT FACTS .............................................................................. 5

    I.     GEICO's Amended Complaint ................................................................. 5

    II.    Defendants' Underlying No-Fault Collections Proceedings.................................. 7

ARGUMENT ....................................................................................................................... 8

    I.     The Court Should Grant GEICO's Request For An Order Staying All
        Pending Arbitrations Filed Against GEICO ........................................... 8

        A.    The Standard on a Motion to Stay ........................................... 8

        B.    Absent the Requested Stay, GEICO Will Suffer Irreparable Harm.......... 10

        C.    GEICO Has Shown it has a Likelihood of Success on the Merits
              or – at a Minimum – a Serious Question Going to the Merits of its
              Declaratory Judgment Claim with the Balance of Equities Tipping
              in its Favor ................................................................................ 15

            1.    Defendants' Interconnected Illegal Kickback and
                 Referral Scheme ....................................................... 16

            2.    Defendants' Fraudulent Treatment and Billing Protocol.............. 19

        D.    The Balance of Hardships Militates in Favor of a Stay ........................... 22

    II.    The Court Should Enjoin the Defendants From Commencing Or
        Prosecuting New Arbitrations or State Court Cases ........................................... 24

    III.    GEICO Should Not Be Required To Post Security For The
        Requested Injunction ........................................................................... 25

CONCLUSION................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Allstate Ins. Co. v. Elzanaty,
    929 F. Supp. 2d 199 (E.D.N.Y. 2013) ........................................8, 10, 11, 12, 13, 15, 16, 22, 25

Allstate Ins. Co. v. Etienne,
    2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. 2010).....................................................................21

Allstate Ins. Co. v. Mun,
    751 F.3d 94 (2d Cir. 2014)........................................................................................................7, 13

Allstate Ins. Co. v. Williams,
    2014 U.S. Dist. LEXIS 170191 (E.D.N.Y. 2014).....................................................................21

Gov't Employees. Ins. Co. v. Strut,
    2020 U.S. Dist. LEXIS 63396 (W.D.N.Y. Apr. 9, 2020) (Sinatra, Jr., J.)................................9

Coastal Distribution, LLC v. Town of Babylon,
    2006 WL 270252 (E.D.N.Y. 2006), aff'd as modified,
    216 F. App'x 97 (2d Cir. 2007) ................................................................................................16

GEICO Ins. Co. v Williams,
    2011 N.Y. Misc. LEXIS 305 (Sup. Ct. Nassau Cty. 2011) ....................................................13

Gov't Employees Ins. Co. v. Cean,
    2019 U.S. Dist. LEXIS 203298 (E.D.N.Y. 2019) (Chen, J.) .......................9, 10, 12, 21, 22, 24

Gov't Employees Ins. Co. v. Mayzenberg,
    No. 17-CV-2802, 2018 WL 6031156
    (E.D.N.Y. Nov. 16, 2018)....................................4, 9, 10, 12, 13, 14, 15, 16, 18, 22, 23, 24, 25

Gov't Employees Ins. Co. v. Strut,
    2019 U.S. Dist. LEXIS 205801 (W.D.N.Y Nov. 26, 2019) (Scott, J.) ........9, 10, 12, 13, 21, 23

Gov't Employees Ins. Co. v. Strutsovskiy,
    2017 U.S. Dist. LEXIS 178514 (W.D.N.Y. 2017) (Vilardo, J.) ....................................9, 10, 12

Gov't Employees Ins. Co. v. Wellmart, RX, Inc.,
    No. 19-CV-4414 (E.D.N.Y. Jan. 16, 2020) (Matsumoto, J.)...........9, 10, 11, 12, 19, 21, 24, 25

Gov't Employees Ins. Co. v. Yan Moshe,
    No. 20-CV-1098 (E.D.N.Y. June 29, 2020) (Block, J.)................................................9, 10, 25

<u>Government Employees Ins. Co., et al. v. Advanced Comprehensive Laboratory,</u>
<u>L.L.C., et al.</u>, No. 20-cv-2391, 2020 WL 7042648 (E.D.N.Y. Dec. 1, 2020)
(Matsumoto, J.) ..................................................................................................9, 10, 11, 23

<u>Government Employees Insurance Co., et al. v. Damien, et al.</u>,
Docket No. CV 10-5409 (SLT)(JMA), Docket No. 63 ........................................................12

<u>Liberty Mut. Ins. Co. v. Excel Imaging, P.C.</u>,
879 F. Supp. 2d 243 (E.D.N.Y. 2012) (Weinstein, J.)............................................9, 10, 12, 25

<u>Matter of Medical Society of New York v. Serio</u>,
100 N.Y.2d 854 (2003) .........................................................................................................4

<u>St. Paul Travelers Ins. Co. v. Nandi</u>,
2007 N.Y. Misc. LEXIS 4417 (Sup. Ct. Queens Cty. 2007)...........................................13, 14

<u>State Farm Mut. Auto. Ins. Co. v. Cohan</u>,
2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. 2009).................................................................21

<u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>,
4 N.Y.3d 313, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005)......................................................4

<u>State Farm Mut. Auto Ins. Co. v. Parisien</u>,
352 F.Supp. 3d 215, 223-229 (E.D.N.Y. 2018)......................................7, 9, 10, 12, 15, 22, 23

**Statutes and Other Authorities**

N.Y. Educ. Law § 6530 ..............................................................................................................4

N.Y. Ins. Law § 5101..................................................................................................................3

N.Y. Ins. Law § 5106..................................................................................................................6

8 N.Y.C.R.R. § 29.1(3) ...............................................................................................................4

11 N.Y.C.R.R. § 65-3.16(a)(12) ......................................................................................4, 5, 6, 18

11 N.Y.C.R.R. § 65-4.1 .............................................................................................................13

## PRELIMINARY STATEMENT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs"), respectfully submit this memorandum of law in support of their motion against Defendants, Northern Medical Care, P.C. ("Northern Medical"), Omar F. Ahmed, M.D. ("Ahmed"), Restoralign Chiropractic, P.C. ("Restoralign Chiro"), David S. Krasner, D.C. ("Krasner"), Wei Dao Acupuncture, P.C. ("Wei Dao"), and Igor Mayzenberg, L.Ac. ("Mayzenberg") (collectively, "Defendants") to temporarily stay and enjoin the Defendants from pursuing claims in other forums while those identical claims are at issue in this action.[1] Specifically, GEICO seeks an Order:

    (i)    staying all No-Fault insurance collection arbitrations pending before the American Arbitration Association ("AAA") between GEICO and the Defendants, and enjoining the Defendants from commencing any further No-Fault insurance collection arbitrations against GEICO, pending the disposition of GEICO's declaratory judgment claim in this action; and

    (ii)    enjoining the Defendants from commencing any No-Fault insurance collection lawsuits against GEICO, pending the disposition of GEICO's declaratory judgment claim in this action.

This action seeks to recover more than $2,900,000.00 that GEICO was defrauded into paying as a result of a massive fraudulent scheme involving the submission of thousands of fraudulent "No-Fault" insurance charges seeking reimbursement for a multitude of medically unnecessary, illusory, and otherwise unreimbursable healthcare services (the "Fraudulent Services") provided to New York automobile victims covered by insurance policies issued by GEICO ("Insureds"). The Fraudulent Services were the product of a scheme perpetrated by the

---

[1] Because this motion seeks to enjoin the Defendants from causing GEICO to be irreparably harmed during the pendency of this action, and because GEICO is currently experiencing irreparable harm as the result of the Defendants' ongoing, piecemeal collection efforts on the claims subject to GEICO's declaratory judgment claim, GEICO respectfully files this motion pursuant to Section III.C of the Court's Individual Rules.

Defendants at a purported medical clinic located at 105-20 Northern Boulevard, Corona, New York 11368 (the "Northern Boulevard Clinic"), where the Defendants generated high volumes of patients that could be subjected to the Fraudulent Services through the payment of hundreds of thousands of dollars in illegal kickbacks furthered through, among other things, a series of shell companies and at least one check cashier in New Jersey.

In addition to money damages, GEICO's Amended Complaint seeks a declaration that GEICO is not obligated to pay more than $3,161,000.00 in pending No-Fault insurance claims that have been submitted or caused to be submitted by and through the Defendants.

The Defendants know that they face better odds of recovering on their fraudulent claims if each bill is reviewed in isolation. In that context, when GEICO denies or disputes bills submitted on behalf of the Defendants, the Defendants routinely file collection "No-Fault" arbitration proceedings with the AAA, or file civil court lawsuits. These arbitrations and civil court lawsuits usually seek reimbursement of a single bill for a single date of service or a limited number of service dates. As a result, the Defendants are currently pursuing collection of more than $1,000,000.00 from GEICO, spread across hundreds of collection actions, including more than 400 individual No-Fault arbitration proceedings pending before the AAA and at least 18 lawsuits pending in New York civil court. See the Declaration of Kathy Asmus attached to the Declaration of Steven T. Henesy, Esq. (the "Henesy Decl."), at Exhibit "3". However, all of the individual bills in these underlying collection actions are the subject of GEICO's declaratory judgment claim.

It is simply inconceivable that the Defendants' piecemeal collection strategy is more convenient or cost effective. In reality, the Defendants are litigating this massive amount of individual bills in piecemeal arbitrations and civil court lawsuits for no legitimate reason aside

from their awareness that they have a better chance of creating the false appearance that their billing is legitimate and reimbursable when it is viewed in isolation. By contrast, and as discussed herein, when viewed in the aggregate, the fraudulent nature of the Defendants' billing is more readily apparent. Indeed, as discussed below, these individual collection proceedings allow for limited or simply non-existent discovery, to the point where one Court in this District noted that an insurer is "essentially defenseless" against fraudulent billing in piecemeal no-fault collection arbitrations.

The detailed allegations of fraud in the Amended Complaint, read in conjunction with the Henesy Decl., and the exhibits annexed thereto, demonstrate that GEICO has more than a likelihood of success on the merits on – or, at a minimum, a serious questions going to the merits of – its declaratory judgment claim. Moreover, GEICO will be irreparably harmed if the Defendants are permitted to continue to pursue their collection arbitrations and civil court lawsuits during the pendency of this action, as all of the underlying collection actions concern the very claims that are the subject of Plaintiffs' declaratory judgment claim and will, if not stayed, result in fragmentation, disparate determinations, and multiplicity of disputes before different courts and forums. By contrast, and as discussed below, the Defendants will not suffer any hardship as the result of a temporary stay of their collection activities during the pendency of this action.

For these reasons, and as discussed in detail below, Plaintiffs' motion should be granted in its entirety.

## OVERVIEW OF NEW YORK'S NO-FAULT LAWS

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal

Injury Protection Benefits ("No-Fault Benefits") to victims of motor vehicle accidents (i.e. Insureds). No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services. An Insured can assign his or her right to No-Fault Benefits to providers of healthcare goods and services in exchange for those goods and services.

Under the No-Fault statutory framework, the reality is "that insurers are given only 30 days to review and investigate claims before paying them without risk of penalties for denying or delaying a claim." Matter of Medical Society of New York v. Serio, 100 N.Y.2d 854, 860-861 (2003). Given the perverse incentives inherent in this system, the No-Fault Laws are often exploited through fraud. As noted by the New York Court of Appeals, it has been common for "ringleaders (often associated with organized crime) [to] purchase minimum automobile insurance, perhaps under a fraudulent name, on wrecked or salvaged vehicles, and recruit others to fill up the vehicles and participate in staged accidents (typically sideswipes or fender benders)", with the purported victims then "steered to corrupt medical clinics, called 'medical mills,' where they feigned aches, pains and soft tissue injuries. The medical mills would then generate stacks of medical bills for each passenger, detailing treatments and tests that were unnecessary or never performed." Id.

Against this backdrop, a healthcare service provider is not eligible to collect No-Fault Benefits if it is unlawfully incorporated or "fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . ." N.Y.C.R.R. § 65-3.16(a)(12). These eligibility requirements were promulgated "to combat rapidly growing incidences of fraud in the no-fault regime." State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 n.2, 827 N.E.2d 758, 794 N.Y.S.2d 700 (2005). In particular, a healthcare service provider is not eligible to collect No-Fault Benefits if it, directly or indirectly, offers, gives, solicits, or

receives any fee or other compensation in exchange for a patient referral. <u>See</u> 8 N.Y.C.R.R. §

29.1(3); <u>see also</u> N.Y. Educ. Law § 6530(18); <u>Gov't Employees Ins. Co. v. Mayzenberg</u>, No. 17-

CV-2802, 2018 WL 6031156, at *7 (E.D.N.Y. Nov. 16, 2018) ("If a medical professional

corporation engages in this unprofessional conduct, it is rendered ineligible for a requested no-

fault reimbursement by virtue of 11 N.Y.C.R.R. § 65-3.16(a)(12)") (<u>quoting</u> <u>Gov't Employees

Ins. Co. v. Badia</u>, No. 13-CV-1720 (CBA), 2015 WL 1258218, at *9 (E.D.N.Y. 2015)).

<b><u>STATEMENT OF RELEVANT FACTS</u></b>

**I.   <u>GEICO'S Amended Complaint</u>**

GEICO first commenced this action on March 5, 2020. <u>See</u> Docket No. 1. GEICO filed

an Amended Complaint on March 16, 2020. <u>See</u> Docket No. 7. Plaintiffs respectfully refer the

Court to the Amended Complaint for the full contours of the Defendants' fraudulent scheme,

inasmuch it is impossible to fully describe every aspect of such a complex fraudulent scheme in a

relatively short memorandum of law. In sum, GEICO's Amended Complaint details a massive

fraudulent No-Fault insurance billing scheme. In particular, GEICO alleges that;

(i)   The Defendants billed GEICO for millions of dollars of fraudulent, medically
unnecessary, and otherwise illusory healthcare "services". These "services" were
the product of a scheme perpetrated by the Defendants at the Northern Boulevard
Clinic, where the Defendants generated high volumes of patients that could be
subjected to the Fraudulent Services through the payment of hundreds of
thousands of dollars in illegal kickbacks. <u>See</u> Docket No. 7, <u>passim</u>.

(ii)   Mayzenberg spearheaded the scheme by using his company, Boruch Laosan, Inc.
("Boruch Laosan") to sublease space at the Northern Boulevard Clinic to
Northern Medical, and Restoralign Chiro (collectively, the "Subleasing PC
Defendants") and, as a condition of their subletting space, the Subleasing PC
Defendants were directed to – and did – pay kickbacks in exchange for patient
referrals to the Northern Boulevard Clinic. <u>See</u> Docket No. 7, ¶¶ 83-102.

(iii)   The Subleasing PC Defendants paid hundreds of thousands of dollars in
kickbacks to a series of individuals and entities that purported to provide
legitimate business services, but instead simply referred automobile accident
patients to the Defendants in exchange for kickback payments (the "Referral
Sources"). <u>See</u> Docket No. 7, ¶¶ 85-87, 92, 93-95. The Referral Sources included

5

a series of shell companies disguised as, among other things, putative "marketing", "advertising", "consulting", "transportation", "cleaning", "administrative", and "construction" companies. <u>See id.</u>, ¶ 84. For example, the Referral Sources included some of the same companies paid by two individuals – Tea Kaganovich and Ramazi Mitaishvili – who, in connection with guilty pleas to health care fraud, admitted to paying approximately $18.5 million in kickbacks for the referral of patients to their diagnostic testing facilities in Brooklyn, Queens, and the Bronx. <u>See id.</u>, ¶ 95 (<u>citing</u> <u>United States of America v. Tea Kaganovich, Ramazi Mitaishvili</u>, 17-CR-00649 (E.D.N.Y. 2019)). The Amended Complaint outlines these payments in detail, down to the identities of the Referral Sources and the dollar amounts of the kickback payments. <u>See id</u>.

(iv)   In addition to the kickbacks he directed the Subleasing PC Defendants to make, Mayzenberg himself – using a complex web of accounts and money laundering – paid kickbacks in exchange for patient referrals to the Northern Boulevard Clinic. <u>See</u> Docket No. 7, ¶¶ 53-82; 103-107. For example, Mayzenberg funneled money through various bank accounts in order to make hundreds of thousands of dollars in kickback payments to: (a) a series of shell companies owned and controlled by Igor Dovman and his wife, Tamilla Dovman a/k/a Tamilla Khanukayev (<u>see id.</u>, ¶¶ 65-82); (b) putative "transportation" companies, including entities called All Points Transportation and One of a Kind (<u>see id.</u>, ¶¶ 59-60); and (c) a series of putative "medical referral service" entities, including Nina Brouk Advertisement, L.L.C. and Dona Catalina Marketing, L.L.C. (<u>see id.</u>, ¶¶ 103-107).

(v)   Once the patients referred to the Defendants pursuant to the kickback scheme presented to the Northern Boulevard Clinic, the Defendants subjected those patients to a pre-determined treatment protocol of medically unnecessary healthcare "services", including patient examinations, computerized range of motion and muscle strength testing, physical performance testing, outcome assessment testing, physical therapy services, neurological examinations, electrodiagnostic testing, acupuncture services, and chiropractic services. <u>See</u> Docket No. 7, ¶¶ 108-573.

Based on these allegations, GEICO asserts claims for civil RICO and RICO conspiracy, fraud, and unjust enrichment, seeking recovery of approximately $2,900,000.00 it paid in reliance on the Defendants' fraudulent billing. <u>See</u> Docket No. 7, ¶¶ 574-677. GEICO also seeks a declaratory judgment, to the effect that the Defendants have no right to receive payment on pending and unpaid No-Fault insurance billing amounting to more than $3,161,000.00. <u>See id.</u>, ¶¶ 5, 590.

## II.    **Defendants' Underlying No-Fault Collections Proceedings**

Under the No-Fault Laws, healthcare providers like the Defendants, as assignees of persons injured in automobile accidents, may submit disputes over payment of individual bills to arbitration.  See N.Y. Ins. Law §5106(b) and 11 N.Y.C.R.R. §§ 65-4.1, et seq. New York's arbitration process for No-Fault coverage is an expedited, simplified affair meant to work as quickly and efficiently as possible. Allstate Ins. Co. v. Mun, 751 F.3d 94, 99 (2d Cir. 2014).  No-Fault arbitrators typically conduct one hearing after another, generally in 15-minute intervals. Discovery is limited or non-existent "and the insurance companies are essentially defenseless." Id. (emphasis added). Complex fraud and RICO claims cannot be shoehorned into this system. Id. These circumstances render it impractical for an arbitrator to adequately consider large scale, complex schemes involving the fraudulent referral of patients in exchange for kickbacks, and the fraudulent predetermined rendering of healthcare services to hundreds of patients.

Healthcare providers also have the option to file civil court proceedings to collect No-Fault Benefits, typically in the New York civil courts. Id. Although there is some ability to conduct discovery in civil court, the amount in controversy, the limited nature of the disputed billing/healthcare services in each case, and the huge volume of cases pending in the civil court system, limit the civil court's ability to address complex fraud claims spanning multiple Insureds, multiple healthcare providers, and multiple bills over lengthy periods of time – especially in cases such as this that involve systematic patterns of fraudulent treatment and billing that may not be evident based on a review of an individual claim involving an individual bill, individual Insured, and individual healthcare provider. See State Farm Mut. Auto Ins. Co. v. Parisien, 352 F.Supp. 3d 215, 223-229 (E.D.N.Y. 2018).

The Defendants, knowing that the expedited No-Fault arbitration and civil court proceedings do not provide the time or resources to address the complex fraud issues presented

in GEICO's Amended Complaint – and knowing that fraudulent treatment protocols are not evident from the review of a single bill submitted under each of the Defendants – continue to pursue collection of the individual bills at issue in this case through arbitration and court proceedings. Specifically, the Defendants have filed the following actions against GEICO, including more than $225,000.00 in AAA arbitrations filed after GEICO filed the Amended Complaint in this action, seeking to collect on the very charges that are subject to GEICO's declaratory judgment claim in the present case: (i) Northern Medical is currently prosecuting 65 AAA arbitrations and 17 civil court lawsuits, seeking to collect more than $200,000.00; (ii) Restoralign Chiro is currently prosecuting 17 AAA arbitrations – including 11 AAA arbitrations seeking to collect more than $5,000.00 filed after GEICO filed the Amended Complaint in this action – and one civil court lawsuit, seeking to collect more than $12,000.00; and (iii) Wei Dao is currently prosecuting 357 AAA arbitrations – including 84 AAA arbitrations seeking to collect more than $200,000.00 filed after GEICO filed the Amended Complaint in this action, seeking to collect more than $870,000.00. See the Declaration of Kathy Asmus attached to the Henesy Decl. at Exhibit "3".

## ARGUMENT

## I.   The Court Should Grant GEICO's Request For An Order Staying All Pending Arbitrations Filed Against GEICO

A temporary stay of the AAA arbitrations is both necessary and warranted, and will not result in any cognizable prejudice to the Defendants.

### A.   The Standard on a Motion to Stay

As Judge Arthur D. Spatt observed in Allstate Ins. Co. v. Elzanaty, in determining whether to stay and enjoin pending No-Fault insurance collection arbitrations:

[C]ourts look to the preliminary injunction standard.  "In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable harm absent injunctive relief; and

(2) 'either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.'"

Allstate Ins. Co. v. Elzanaty, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013) (quoting Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010)).

District Courts within the Second Circuit consistently have applied this standard to determine whether to stay a defendant healthcare provider's No-Fault collection arbitrations pendency a plaintiff-insurer's fraud and declaratory judgment action. See, e.g., Government Employees Ins. Co., et al. v. Advanced Comprehensive Laboratory, L.L.C., et al., No. 20-cv-2391, 2020 WL 7042648 (E.D.N.Y. Dec. 1, 2020) (Matsumoto, J.); Gov't Employees Ins. Co. v. Axial Chiropractic, P.C., No. 19-CV-5570, Docket No. 56 (E.D.N.Y. Apr. 27, 2020)  (Gold, J.), report and rec. adopted at Docket Entry Dated July 29, 2020 (Vitaliano, J.); Gov't Employees Ins. Co. v. Yan Moshe, No. 20-CV-1098 (E.D.N.Y. June 29, 2020) (Block, J.); See, e.g., Gov't Employees Ins. Co. v. Cean, 2019 U.S. Dist. LEXIS 203298 at *11-12 (E.D.N.Y. 2019) (Chen, J.); State Farm Mut. Auto. Ins. Co. v. Parisien, 352 F. Supp. 3d 215, 233 (E.D.N.Y. 2018) (Glasser, J.); Gov't Employees Ins. Co. v. Mayzenberg, No. 17-CV-2802, 2018 WL 6031156 at *5 (E.D.N.Y. Nov. 16, 2018) (Glasser, J.); Gov't Employees Ins. Co. v. Wellmart, RX, Inc., No. 19-CV-4414 (E.D.N.Y. Jan. 16, 2020) (Matsumoto, J.); Gov't Employees Ins. Co. v. Strutsovskiy, 2017 U.S. Dist. LEXIS 178514 at *5 (W.D.N.Y. 2017) (Vilardo, J.); Gov't Employees Ins. Co. v. Strut, ("Strut II") 2019 U.S. Dist. LEXIS 205801 at *30 (W.D.N.Y Nov. 26, 2019) (Scott, J.); report and rec. adopted by Gov't Employees. Ins. Co. v. Strut, 2020 U.S. Dist. LEXIS 63396 (W.D.N.Y. Apr. 9, 2020) (Sinatra, Jr., J.); and Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 879 F. Supp. 2d 243, 264 (E.D.N.Y. 2012) (Weinstein, J.) (all staying and enjoining defendant healthcare providers' no-fault collections arbitration during the pendency of plaintiff-insurers'

fraud and declaratory judgment actions, based on application of identical preliminary injunction standard).

More generally, "courts in this district frequently stay arbitration pending ongoing litigation due to considerations of judicial economy, the possibility of inconsistent results, and the inferiority of arbitration as a means of resolving fraud claims." See Government Employees Insurance Co. et al. v. Sheepshead Bay Medical Supply, Inc et al., E.D.N.Y. 18-cv-4039 (ENV)(RML) at Docket No. 31, p. 10.

**B.    Absent the Requested Stay, GEICO Will Suffer Irreparable Harm**

As Judge Spatt noted in the Elzanaty case, the "showing of irreparable harm is [p]erhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." Id. at 221, quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002).

In this context, multiple federal courts – including Judge Gold in Axial Chiropractic, Judge Block in Moshe, Judge Chen in Cean, Judge Spatt in Elzanaty, Judge Glasser in Parisien and Mayzenberg, Judge Vilardo in Strutsovskiy, Judge Scott and Judge Sinatra, Jr. in Strut II, Judge Matsumoto in Wellmart and Advanced Comprehensive, and Judge Weinstein in Excel Imaging –  have each concluded that wasting time and resources in arbitrations with awards that might eventually be, at best, inconsistent with judicial rulings and, at worst, essentially ineffective, constitute the irreparable harm necessary to support similar stays and injunctions.

For example, in Elzanaty – as in the present case – the plaintiff-insurers sued defendant healthcare providers seeking, among other things, a declaratory judgment that the healthcare providers were not entitled to collect on their pending no-fault insurance billing. See Elzanaty, supra, at 204-05. For their part, the defendant healthcare providers commenced arbitration on their pending no-fault insurance billing, and then moved to compel arbitration with respect to

10

their pending billing. Id. at 205-06. Though Judge Spatt agreed that the healthcare providers'

claims with respect to their pending billing were arbitrable, and though Judge Spatt granted the

healthcare providers' motion to compel arbitration on the billing, he went on to grant the

plaintiff-insurers' motion to stay and enjoin the healthcare providers' no-fault collection

arbitrations pending the disposition of the insurers' declaratory judgment claim. Id. at 211-213,

217-222.  He did so because:

> there is a concern here with wasting time and resources in an arbitration with awards that
> might eventually be, at best, inconsistent with this Court's ruling, and at worst, essentially
> ineffective. The Court need not address now the precise effect of an inconsistent
> declaratory judgment from this Court on certain arbitration awards. It is sufficient to
> recognize the large realm of potential problems this may cause on the validity of those
> awards, especially in light of their multitude and internal inconsistency with each other.
> Thus, the Court agrees that allowing a large number of proceedings to be heard by a mix
> of arbitrators, each of whom will likely come to their own independent and potentially
> contradictory conclusions, will result in harm to Allstate from which it cannot recover.

Id. at 222.

The legion of decisions following Elzanaty in the Second Circuit are in accord. More

recently, in Advanced Comprehensive, Judge Matsumoto noted that, "[w]here as here and in

Wellmart, an insurer alleges a risk of inconsistent judgments in No-Fault arbitrations and RICO-

and fraud-based litigation in federal court, district courts in this Circuit have found irreparable

harm." Advanced Comprehensive, supra, at *4 (citing Mayzenberg, Wellmart, Moshe, Cean, and

Strutsovskiy, all supra). Judge Matsumoto continued:

> If Advanced Labs is permitted to prosecute the ongoing collection proceedings, GEICO
> faces imminent and nonspeculative risks of inconsistent judgments and unnecessary
> expenditure of time and resources on arbitrations that may be resolved by the instant,
> pending declaratory judgment action. Accordingly, the court concludes that GEICO has
> demonstrated irreparable harm absent injunctive relief.

Id. at *5.

Judge Gold reached a substantially identical conclusion in Axial Chiropractic:

Plaintiffs face the risk that the pending arbitrations will result in awards inconsistent with any final judgment in this case. Courts have repeatedly held that this risk, which requires an insurer to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action, constitutes irreparable harm.

Axial Chiropractic at * 11 (internal quotations omitted).

Judge Glasser also reached a substantially identical conclusion in Mayzenberg:

While it is true that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury," Martin, 680 F.Supp. at 621, money, time, and resources spent arbitrating these claims are not the only potential injuries here. The concern is that allowing over 180 arbitrations to be heard by a mix of arbitrators, each of whom will likely come to their own independent and contradictory conclusions that may be rendered ineffective by this Court, will result in harm to GEICO from which it cannot recover.

Mayzenberg at * 14 - * 15.

Judge Glasser also recently reached a substantially identical conclusion in Parisien:

Courts have readily held that irreparable harm occurs where, as here, an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action. See Government Employees Insurance Company v. Strutsovskiy, 2017 U.S. Dist. LEXIS 178514, 2017 WL 4837584, at *6 (W.D.N.Y. Oct. 26, 2017); Allstate Ins. Co. v. Elzanaty, 929 F.Supp.2d 199, 222 (E.D.N.Y. 2013). On the reasoning of these cases, the Court agrees that State Farm has demonstrated irreparable harm.

Parisien at * 34. See also Cean, supra, at *5 (finding that "[i]rreparable harm occurs where 'an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action.'") (quoting Parisien and citing Mayzenberg).

Judge Vilardo reached a substantially identical conclusion in Strutsovskiy:

As GEICO notes in its motion to stay arbitration, multiple federal and state courts have concluded that wasting time and resources in arbitrations that might result in awards inconsistent with future judicial rulings constitutes irreparable harm sufficient to stay arbitration.

Id. at * 18. See also Wellmart at * 13 (the conclusion that wasting time and resources in arbitrations might result in awards inconsistent with future judicial rulings constitutes irreparable harm sufficient to stay arbitration has been "reiterated time and again in this Circuit."); Excel Imaging, 879 F. Supp. 2d at 264; Government Employees Insurance Co., et al. v. Damien, et al., Docket No. CV 10-5409 (SLT)(JMA), Docket No. 63. See also Strut II, supra, at * 7 ("numerous courts in the Second Circuit have held that risk of inconsistent judgments in no-fault arbitrations and RICO- and fraud-based litigation in federal court constitutes irreparable harm.").

Furthermore, it is worthwhile to note that – as Judge Spatt observed in Elzanaty – "a large number of New York State courts have stayed arbitrations under precisely the same facts as in the present case." Id., 979 F. Supp. 2d at 221 (collecting cases). Significantly, these state court decisions generally held that the potential inconsistencies amongst the prospective arbitral awards themselves, and between the arbitral awards and the outcome of the insurers' declaratory judgment claims, satisfied the irreparable injury requirement. See, e.g., GEICO Ins. Co. v Williams, 2011 N.Y. Misc. LEXIS 305 at * 7 (Sup. Ct. Nassau Cty. 2011); St. Paul Travelers Ins. Co. v. Nandi, 2007 N.Y. Misc. LEXIS 4417 at * 22 (Sup. Ct. Queens Cty. 2007).[2]

The risk of inconsistent judgments is underscored by the fact that – in contrast to the present case – GEICO does not have a full and fair opportunity to litigate the legitimacy of the Defendants' "treatment" and billing practices in the context of the expedited arbitration system set forth in the New York no-fault insurance law. For instance, the expedited No-Fault arbitration procedure set forth in 11 N.Y.C.R.R. § 65-4.1 generally contemplates no substantive discovery in

---

[2] See also Mayzenberg at * 12 (noting that a stay of no-fault collections arbitration pending the disposition of a plaintiff-insurer's fraud and declaratory judgment claims also served the interests of judicial economy, considering that "[i]f GEICO prevails on its declaratory judgment claim, it will be forced to institute over 180 separate lawsuits to vacate the arbitration awards, only increasing the burden on New York state courts, costs for all parties involved in this action, and premiums for insureds.").

advance of the hearing, nor does it generally permit any meaningful examination or cross-examination of witnesses. See Mun, supra, at 99 (2d Cir. 2014)("New York's arbitration process for no-fault coverage is an expedited, simplified affair meant to work as quickly and efficiently as possible. … Discovery is limited or non-existent. … Complex fraud and RICO claims, maturing years after the initial claimants were fully reimbursed, cannot be shoehorned into this system.") Indeed, as Judge Gold noted in Axial Chiropractic, "the expedited procedures in no-fault arbitration proceedings further increase the risk of inconsistent judgments. … Relatedly, arbitration claims may be consolidated only when they arise out of the same incident. This restriction limits plaintiffs' ability in arbitration proceedings to demonstrate a pattern of diagnoses and treatments indicative of fraud …" Id. at * 12. Similarly, Judge Glasser concluded in Mayzenberg, "GEICO also argues that expedited no-fault arbitration is simply not the appropriate venue to litigate large-scale, complex fraud allegations involving thousands of claims over the course of several years. The Court agrees. … New York's arbitration process for No-Fault coverage is a 'special expedited,' simple affair designed to work as quickly as possible. ... For example, discovery is limited or non-existent and the insurance companies are essentially defenseless." Id. at * 16-17 (emphasis added, internal quotations omitted).[3]

There is no material distinction between the cases cited above and the present case. Here, as in the cases cited above, a plaintiff-insurer asserts various racketeering and other fraud-based claims against defendant healthcare providers, and seeks a declaratory judgment to the effect that the healthcare providers should be prohibited from collecting no-fault insurance benefits based on their fraudulent activity and other failures to comply with the pertinent law. In the present

---

[3] See also Strutt II, supra (noting that "[p]laintiffs may maintain RICO and fraud claims in federal court, notwithstanding New York's no-fault scheme is ill-equipped to handle claims involving systemic fraud" and "Plaintiffs' claims are based on a pattern of fraud, which must be viewed in the aggregate—something that the no-fault scheme does not allow for.").

case, as in the cases cited above, the healthcare providers have commenced a massive amount of separate arbitrations aimed at recovering the same no-fault insurance benefits that are the subject of the plaintiff-insurer's declaratory judgment claim. Additionally, in the present case, as in the cases cited above, the likely inconsistencies amongst the prospective arbitral rulings themselves, and between the prospective arbitral rulings and this Court's ultimate disposition of the declaratory judgment and fraud-based claims, threaten GEICO with irreparable harm absent injunctive relief.

> **C.    GEICO Has Shown it has a Likelihood of Success on the Merits or – at a Minimum – a Serious Question Going to the Merits of its Declaratory Judgment Claim with the Balance of Equities Tipping in its Favor**

GEICO has shown it has a likelihood of success on the merits on – or, at a minimum, a serious questions going to the merits of – its declaratory judgment claim. In fact, the detailed allegations in the Amended Complaint leave little doubt that GEICO has shown, at the least, sufficiently serious questions going to the merits to make them a fair ground for litigation. GEICO's Amended Complaint, indeed, sets forth considerable evidence that the Defendants operated in pervasive violation of New York law.

In this context, it is worthwhile to note the standards that courts have applied – in this exact context – in determining whether a plaintiff-insurer has made a showing warranting a stay. For example, in Elzanaty, Judge Spatt found that the plaintiff-insurers demonstrated sufficiently serious questions going to the merits where they "detailed a complicated scheme of alleged fraudulent activity" in their complaint. Elzanaty, supra, at 222. In Axial Chiropractic, Judge Gold rejected the argument that documentary evidence is necessary to demonstrate a likelihood of success or serious questions as to the merits, finding "while a 'fact-laden discovery process' may help demonstrate a likelihood of success, it is not essential to a showing that a case presents a serious question going to the merits. … plaintiffs' Complaint is hardly conclusory; to the

contrary, in their Complaint, plaintiffs extensively set forth specific facts that 'adequately detail[] a complicated scheme of fraudulent activity.' …. Having done so, plaintiffs have raised serious questions going to the merits of their claims." Id. at * 16-18. In Parisien, Judge Glasser found that State Farm raised sufficiently serious questions going to the merits where it had "adequately detailed a complicated scheme of alleged fraud activity" and it could not be said that the request for injunctive relief "rest[s] on mere hypotheticals". Id. at * 37.

Similarly, in the present case, GEICO's Amended Complaint provides granular detail regarding the Defendants' complicated scheme of alleged fraudulent activity, raising "at least a serious question about a scheme of fraudulent activity", that does not by any reasonable metric "rest on mere hypotheticals".

### 1.    Defendants' Interconnected Illegal Kickback and Referral Scheme

The Amended Complaint sets forth considerable evidence that the Defendants were involved in an illegal kickback and referral scheme.[4] Therefore, as discussed, below, Plaintiffs have "adequately detailed a complicated scheme of alleged fraudulent activity," and their motion should be granted. See Elzanaty, supra, at 222.

First, GEICO alleges that the Subleasing PC Defendants were required – as a condition of their putative "lease" agreements with Mayzenberg and Boruch Laoson – to pay kickbacks in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic. This allegation is not made in a conclusory vacuum. To the contrary, as alleged in the Amended Complaint, through their companies, the Subleasing Owner Defendants paid hundreds of

---

[4] It is important to emphasize that the evidence outlined herein goes well beyond what is required to satisfy the "likelihood of success" element to allow for the issuance of a preliminary injunction. See, e.g., Coastal Distribution, LLC v. Town of Babylon, 2006 WL 270252, at *5 (E.D.N.Y. 2006), aff'd as modified, 216 F. App'x 97 (2d Cir. 2007) ("For purposes of a preliminary injunction, however, this Court need not find with "absolute certainty" that Plaintiffs will succeed on the merits of their claims.").

thousands of dollars in kickbacks to a series of individuals and entities that purported to provide legitimate business services, but instead simply referred automobile accident patients to the Defendants in exchange for kickback payments. The Referral Sources included a series of shell companies disguised as, among other things, putative "marketing", "advertising", "consulting", "transportation", "cleaning", "administrative", and "construction" companies. See Docket No. 7, ¶¶ 83-102.

For example, GEICO alleges that Ahmed paid kickbacks from a bank account associated with his professional corporation, Queens Corona Medical, P.C. ("Queens Corona") to the Referral Sources. As set forth in the Complaint, though Queens Corona's name gives it the appearance of a healthcare professional corporation, Queens Corona was never an actual healthcare provider. Instead, it was used as a vehicle to make concealed, unlawful payments in exchange for patient referrals. Similarly, GEICO alleges that Krasner used Restoralign Chiro's bank account to pay tens of thousands of dollars in kickbacks to the Referral Sources in exchange for the referral of automobile accident victims to the Northern Boulevard Clinic. A small representative sample of checks evidencing these kickback payments from Ahmed and Krasner through their respective entities is attached to the Henesy Decl. as Exhibit "1".[5]

Similarly, the Amended Complaint alleges that Mayzenberg – using a complex web of personal and corporate bank accounts to launder money – paid kickbacks in exchange for patient referrals to the Northern Boulevard Clinic. In particular, the Amended Complaint outlines Mayzenberg's pattern and practice of laundering hundreds of thousands of dollars through various bank accounts to facilitate kickback payments to shell companies secretly controlled by Igor Dovman and his wife, Tamilla Dovman (the "Dovman Shell Entities"). See Docket No. 7,

---

[5] The financial records attached to the Henesy Decl. are merely representative examples. Plaintiffs are prepared to provide the Court with additional financial records substantiating the allegations in the Amended Complaint should the Court wish to review them in the context of this motion.

¶¶ 65-82. Indeed, during a deposition in a previous action, Igor Dovman invoked the Fifth Amendment privilege against self-incrimination when asked whether he had received kickbacks in exchange for patient referrals to Mayzenberg. A small representative sample of checks evidencing payments from Mayzenberg to the Referral Sources and the Dovman Shell Entities is attached to the Henesy Decl. as Exhibit "2". Relevant excerpts of Igor Dovman's deposition testimony are attached to the Henesy Decl. as Exhibit "4".

These allegations, if proven, would result in the Defendants being ineligible to collect No-Fault benefits from GEICO. See Mayzenberg, supra at *7 ("If a medical professional corporation engages in this unprofessional conduct, it is rendered ineligible for a requested no-fault reimbursement by virtue of 11 N.Y.C.R.R. § 65-3.16(a)(12)").

Moreover, Plaintiffs have obtained ample evidence supporting these kickback allegations through the discovery they have been able to obtain to date. Solely by way of example, Plaintiffs discovered that many of the reimbursement checks issued by GEICO to Northern Medical were not deposited into any bank account, but were instead cashed at a check casher in Clifton, New Jersey. A representative sample of these checks is attached to the Henesy Decl. as Exhibit "5". The owner of that check casher, Jerome Reed, signed a declaration swearing that the Northern Medical checks were cashed not by Ahmed, but by an individual named Alla Kuratova who, in 2013, was charged by the New York City Narcotics Prosecutor for her role in a massive prescription drug trafficking ring. Copies of Mr. Reed's declaration and the press release from the United States Drug Enforcement Administration are attached to the Henesy Decl. as Exhibits "6" and "7", respectively.[6] In particular, according the DEA press release, Ms. Kuratova "allegedly recruited other individuals to act as phony patients in visits with the corrupt medical

---

[6] Moreover, the documents provided to GEICO by Mr. Reed further indicate that there were a number of individuals authorized to cash checks on Northern Medical's behalf, but that Ahmed – Northern Medical's supposed sole owner – was not among those so authorized. See Henesy Decl., Exhibit "6".

practitioners." Even so, during a December 3, 2020 deposition, Ms. Kuratova – who confirmed that she pleaded guilty to at least one felony count following her arrest – denied all knowledge of Northern Medical and the Clifton check casher, and denied having cashed any checks on Northern Medical's behalf – despite the fact that the Clifton check casher was in possession of a recent copy of her driver's license.[7] Relevant portions of Ms. Kuratova's deposition transcript are attached to the Henesy Decl. as Exhibit "8".

Against this backdrop, Plaintiffs have demonstrated more than a likelihood of success on the merits of their declaratory judgment claim.

### 2.     Defendants' Fraudulent Treatment and Billing Protocol

Even if GEICO did not have the above-outlined evidence concerning the Defendants' participation in an illegal kickback/patient referral scheme, it has very colorably alleged that the Defendants made pervasive misrepresentations regarding the medical necessity of their supposed healthcare "services".

In particular, once the patients had been illegally referred to the Northern Boulevard Clinic through the payment of kickbacks, the Defendants subjected those patients to predetermined treatment protocols designed to maximize the Defendants' profits, rather than to treat or otherwise benefit the patients. The massive amount of healthcare "services" billed to GEICO by the Defendants were medically useless, and were submitted for reimbursement using

---

[7] The negotiation of GEICO reimbursement checks to untraceable cash all but assures that it would be difficult – if not impossible – for GEICO to ever recover those monies from the Defendants. See, e.g., Wellmart RX, supra ("[A]t this stage, it may be plausibly inferred that Wellmart has deliberately stripped its account of funds, either intentionally or incidentally frustrating GEICO's ability to collect a judgment in the future. If Wellmart is permitted to prosecute ongoing collection proceedings, GEICO's risk may not be limited to inconsistent judgments, or the unnecessary expenditure of time and resources. It is not at all speculative that any dollar awarded to Wellmart in a AAA or state court collection proceeding may be permanently unrecoverable, even if GEICO ultimately prevails in this case.").

billing codes that misrepresented the services that purportedly were provided in order to inflate the charges to GEICO. <u>See</u> Docket No. 7, ¶¶ 108-573.

Solely by way of example, Northern Medical and Ahmed virtually always billed GEICO for an initial examination using the highest-allowable Current Procedural Terminology ("CPT") code, 99205. <u>See</u> Docket No. 7, ¶¶ 137-143. Though the use of CPT code 99205 typically requires the physician to spend 60 minutes of face-to-face time with the patient, Northern Medical and Ahmed's initial examinations did not require 60 minutes of face-to-face time. Similarly, though the use of CPT code 99205 typically requires the examining physician to engage in "complex" medical decision-making, it is clear that, not only did Northern Medical and Ahmed not engage in "complex" decision-making, they never engaged in any legitimate medical decision-making at all. Instead, Northern Medical and Ahmed simply provided patients with substantially identical "diagnoses", and prescribed a virtually identical course of extensive and unnecessary treatment for each Insured, which included mispresenting the nature, extent and complexity of the Insureds' injuries in order to justify billing for additional Fraudulent Services. <u>See id</u>., ¶¶ 160-173.

Northern Medical and Ahmed also routinely subjected the Insureds to medically unnecessary follow-up examinations, computerized range of motion testing, computerized range of motion and computerized muscle strength testing, physical performance testing, outcome assessment testing, neurological examinations followed by electromyography tests and nerve conduction velocity tests, and physical therapy services, all to maximize the fraudulent charges that they could submit to GEICO rather than to genuinely treat the patients. <u>See</u> Docket No. 7, ¶¶ 174-207, 214-456.

Similarly, Krasner and Restoralign Chiro routinely subjected the Insureds at the Northern Boulevard Clinic to a course of medically unnecessary chiropractic services, consisting of illusory chiropractic examinations and long-term, medically unnecessary chiropractic manipulation services. These supposed "services" too were administered pursuant to a pre-determined treatment protocol designed solely to maximize billing rather than to treat or otherwise benefit the Insureds subjected to it. See Docket No. 7, ¶¶ 457-491.

Along similar lines, Mayzenberg and Wei Dao subjected the Insureds at the Northern Boulevard Clinic to a course of medically unnecessary acupuncture services, including: (i) fraudulent acupuncture examinations, at the conclusion of which virtually every Insured received similar diagnoses and the recommendation that they treat with Wei Dao several times per week; (ii) routinely providing medically unnecessary follow-up examinations, virtually all of which included barely legible examination forms and are comprised of entirely boilerplate language; and (iii) routinely subjecting the Insureds to excessive acupuncture treatment that consisted of three units of acupuncture per treatment date, cupping and moxibustion to maximize profits rather than genuinely treat the Insureds. See Docket No. 7, ¶¶ 492-573.

In this context, federal courts within the Second Circuit routinely have adjudicated no-fault fraud cases where the alleged fraud was based solely on misrepresentations as to the medical necessity of the underlying services, or whether they actually were performed in the first instance – with no allegations regarding misrepresentations of the legitimacy of a healthcare provider's corporate structure. See, e.g., Axial Chiropractic, supra, Wellmart RX, Inc, supra; Cean, supra, Strut II, supra, Allstate Ins. Co. v. Williams, 2014 U.S. Dist. LEXIS 170191 (E.D.N.Y. 2014); Allstate Ins. Co. v. Etienne, 2010 U.S. Dist. LEXIS 113995 (E.D.N.Y. 2010); State Farm Mut. Auto. Ins. Co. v. Cohan, 2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. 2009).

Moreover, it is worthwhile to emphasize that the nature of the Defendants' fraudulent billing and treatment protocol, by and large, would not be readily evident upon the review of a single bill in a single arbitration. However, an aggregated review of the hundreds upon hundreds of bills and treatment reports submitted by each of the Defendants to GEICO reveals a systematic pattern in which the patients treated at the Northern Boulevard Clinic by the Defendants are routinely subjected to a nearly identical course of treatment, without regard to the patients' individual circumstances. Indeed, every aspect of the Defendants' fraudulent treatment protocols were designed to falsely rationalize past treatment and falsely justify future treatment in an effort to exploit each Insured's No-Fault benefits to the maximum extent possible. These circumstances militate in favor of a stay as well. See, e.g., Parisien, supra at 229 (noting that "[b]ecause it is only through this tapestry of facts that the alleged fraud comes into focus, [plaintiff] may not as a practical matter have a fair opportunity to present its claims unless it is permitted to direct the trier of fact to all of the claims at issue.").

Against this backdrop, Plaintiffs have shown that there are, at the least, serious questions as to the merits with, as set forth below, the balance of hardships tipping in Plaintiffs' favor.

### D.     The Balance of Hardships Militates in Favor of a Stay

The Defendants will suffer no hardship if their right to collect on their pending billing is adjudicated in a single, efficient declaratory judgment action, rather than on a piecemeal basis in multitudinous arbitral and civil court proceedings with the prospect of significantly varying outcomes.  See, e.g., Mayzenberg, supra ("[I]t is obviously more efficient and beneficial for Defendants if all of their claims are resolved in one action, rather than hundreds of different proceedings."); see also Cean, supra, at *14 ("[g]ranting the stay and injunction will actually save all parties time and resources."); Elzanaty, supra.

There are plain and obvious efficiency interests served by litigating the Defendants' eligibility to collect reimbursement in a single forum – which have repeatedly been held to tip the balance of hardships in the plaintiff-insurer's favor. See, e.g., Elzanaty, 929 F. Supp. 2d at 222 ("Here, especially, [defendant] will benefit from the stay if it ultimately prevails in this matter, because it will be entitled to the collection of interest at a rate of two percent every month that the No-fault payments are overdue); Axial Chiropractic, supra ("Here, the balance of hardships favors granting the injunction. Absent a stay, plaintiffs will face 'a multitude of individual arbitrations.' … Defendants, on the other hand, will be compensated for any delay in obtaining no-fault reimbursements because they are entitled to statutory interest on unpaid claims."); Parisien, supra at * 38 (finding that the balance of hardships tipped in favor of injunctive relief where "[i]f the preliminary injunction is granted and State Farm fails to prove its claims, then, at worst, Defendants' recovery of the no-fault benefits to which they are entitled will be delayed … ."); Mayzenberg, supra, at * 22-23 ("[I]t is obviously more efficient and beneficial for Defendants if all of their claims are resolved in one action, rather than hundreds of different proceedings."). Strut II, supra at *6 ("The balance of equities tips decidedly in favor of Plaintiffs. As other courts have held when presented with similar facts, it is more efficient and beneficial for Defendants if all of their claims are resolved in one action, rather than in hundreds of different proceedings.") (internal quotation omitted).

Under these circumstances, the Defendants should welcome the opportunity to have their numerous claims for payment against GEICO adjudicated in a single forum, since the individual bills at issue in the underlying collection matters are the very same bills that are at issue in GEICO's declaratory judgment claim pending in this case. At minimum, they will suffer no hardship from the temporary stay. See, e.g., Advanced Comprehensive, supra, ("in balancing the

hardships experienced by defendants, this court also concludes that defendants will suffer no prejudice if their right to collect the pending billing is adjudicated in a single declaratory judgment action. 'Indeed, granting the stay and injunction will actually save all parties time and resources. Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action.'") (quoting Cean, supra). Accordingly, the balance of hardships tips decidedly in favor of a temporary stay as requested by Plaintiffs.

**II.      The Court Should Enjoin the Defendants From Commencing Or Prosecuting New Arbitrations or State Court Cases**

Finally, the Court also should grant Plaintiffs' motion to enjoin the Defendants from commencing any new No-Fault arbitration collection proceedings or civil court collection cases in the name of any of the Defendants against Plaintiffs during the pendency of this action.  In similar situations, courts have not hesitated to enjoin filings of not only new arbitrations, but also new lawsuits. See e.g., Cean, supra, at *14 (enjoining defendants from commencing any no-fault insurance collection lawsuits, and noting that "[i]n this case, GEICO is asking the Court to, inter alia, restrain a party from instituting state proceedings. It is well-settled that a district court may do that."); Mayzenberg, supra at *19 (same); Wellmart, supra at * 29 (same).

Moreover, Courts in this District – under nearly identical circumstances – have enjoined healthcare providers from commencing additional collection arbitrations or collections pending the disposition of a claim for a declaratory judgment. See, e.g., Mayzenberg, supra ("This Court will have all claims and defenses before it necessary to rule on GEICO's declaratory judgment action and Defendants' claims that they are in fact eligible to receive No-Fault Benefits. It is in the interests of judicial economy to resolve the controversy in a single action, rather than require the parties and the lower courts to engage in piecemeal and repetitive litigation."); see also Cean,

supra ("granting the stay and injunction will actually save all parties time and resources. Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action.").

Accordingly, a temporary stay enjoining the Defendants from commencing or prosecuting any new no-fault collections proceedings during the pendency of this action is fully warranted.

## III.     GEICO Should Not Be Required To Post Security For The Requested Injunction

As discussed above, the requested injunction will not cause Defendants any prejudice at all, inasmuch as – in the unlikely event that Defendants ultimately prevail in this case – they will be entitled to collect a high rate of interest on their outstanding no-fault insurance claims. Accordingly, GEICO should not be required to post any security for the requested injunction.  See, e.g., Mayzenberg at * 30 - * 31 (granting injunction without requiring security based on these considerations); Elzanaty, 929 F. Supp. 2d at 222 (granting injunction without requiring security); Moshe, supra (same); Excel Imaging, P.C., supra (same); Wellmart, supra (same).  In this context, courts have discretion to waive the security requirement of Rule 65(c), especially where – as here – a movant has not demonstrated any proof of likelihood of actual harm. See, e.g., Moshe, supra (holding GEICO "undoubtedly has the ability to pay if defendants prevail" and "[a]s such, defendants will suffer no harm from the injunction").

Accordingly, GEICO respectfully submits that it should not be required to post security for the requested injunction.

## CONCLUSION

For the aforementioned reasons, GEICO's motion should be granted in its entirety, together with such other and further relief as to the Court may seem just and proper.

Dated: February 10, 2021
        Uniondale, New York

RIVKIN RADLER LLP


By: _____/s/ *Steven T. Henesy*_____
        Barry I. Levy
        Michael A. Sirignano
        Steven T. Henesy
        Garin Scollan
926 RXR Plaza
Uniondale, New York  11556
(516) *357-3000*
*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and GEICO*
*Casualty Company*

4768152

26